# Exhibit A

**Hague Convention of 18 March 1970 on the
Taking of Evidence Abroad in Civil or Commercial Matters**
*Convention de La Haye du 18 mars 1970 sur
l'obtention des preuves à l'étranger en matière civile ou commerciale*

| 1. | **Sender**<br>*Expéditeur* | Robert A. Delafield II, Nelson Bumgardner Conroy PC<br>3131 West 7th St., Suite 300, Fort Worth, TX 76107 USA<br>(With the permission of the Requesting Authority) |
|---|---|---|
| 2. | **Central Authority of the Requested State**<br>*Autorité centrale de l'État requis* | Ministry of Justice of China, International Legal Cooperation Center<br>33, Pinganli Xidajie, Xicheng District, Beijing 100035, China |
| 3. | **Person to whom the executed request is to be returned**<br>*Personne à qui les pièces constatant l'exécution de la demande doivent être renvoyées* | Clerk<br>US District Court for the Western District of Texas<br>800 Franklin Ave., Rm. 380, Waco, TX 76701 USA |
| 4. | **Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request**<br>*Indiquer la date limite à laquelle l'autorité requérante désire recevoir la réponse à la commission rogatoire* | |
| | **Date**<br>*Date limite* | May 13, 2022. |
| | **Reason for urgency***<br>*Raison de l'urgence* | The trial is scheduled to begin on June 13, 2022. |

**In conformity with Article 3 of the Convention, the undersigned applicant has the honour to submit the following request:**
*En conformité de l'article 3 de la Convention, le requérant soussigné a l'honneur de présenter la demande suivante :*

| 5. a | **Requesting authority (Art. 3(a))**<br>*Autorité requérante (art. 3(a))* | United States District Court for the Western District of Texas |
|---|---|---|
| b | **To the Competent Authority of (Art. 3(a))**<br>*À l'Autorité compétente de (art. 3(a))* | The People's Republic of China |
| c | **Names of the case and any identifying number**<br>*Nom de l'affaire et numéro d'identification de l'affaire* | Unification Technologies LLC v. Micron Technology, Inc., et al., Civ. A. No. 6:20-CV-500 |

| 6. | **Names and addresses of the parties and their representatives (including representatives in the Requested State*) (Art. 3(b))**<br>*Identité et adresse des parties et de leurs représentants (y compris représentants dans l'État requis) (art. 3(b))* | |
|---|---|---|
| a | **Plaintiff**<br>*Demandeur* | Unification Technologies LLC |
| | **Representatives**<br>*Représentants* | See Attachment A |
| b | **Defendant**<br>*Défendeur* | Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC |

| | | |
|---|---|---|
| | **Representatives**<br>*Représentants* | See Attachment A |
| *c* | **Other parties**<br>*Autres parties* | Not Applicable |
| | **Representatives**<br>*Représentants* | Not Applicable |

| | | |
|---|---|---|
| **7.** *a* | **Nature of the proceedings (divorce, paternity, breach of contract, product liability, etc.) (Art. 3(c))**<br>*Nature et objet de l'instance (divorce, filiation, rupture de contrat, responsabilité du fait des produits, etc.) (art. 3(c))* | Civil action seeking damages for patent infringement. |
| *b* | **Summary of complaint**<br>*Exposé sommaire de la demande* | See Attachment B |
| *c* | **Summary of defence and counterclaim\***<br>*Exposé sommaire de la défense ou demande reconventionnelle* | See Attachment B |
| *d* | **Other necessary information or documents\***<br>*Autres renseignements ou documents Utiles* | A copy of the complaint and the answer are attached to this request. |

| | | |
|---|---|---|
| **8.** *a* | **Evidence to be obtained or other judicial act to be performed (Art. 3(d))**<br>*Actes d'instruction ou autres actes judiciaires à accomplir (art. 3(d))* | The Requesting Authority requests that the competent authorities of the People's Republic of China compel the production of documents and compel the testimony specified on Attachment C. |
| *b* | **Purpose of the evidence or judicial act sought**<br>*But des actes à accomplir* | The evidence sought is relevant to proof of patent infringement. |

| | | |
|---|---|---|
| **9.** | **Identity and address of any person to be examined (Art. 3(e))\***<br>*Identité et adresse des personnes à entendre (art. 3(e))* | Memblaze Technology Co., Ltd., Building B2, Dongsheng Park, 66 Xixiaokou Rd., Haidan District, Beijing 100192, China |

| | | |
|---|---|---|
| **10.** | **Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined (Art. 3(f))\***<br>*Questions à poser ou faits sur lesquels les personnes susvisées doivent être entendues (art. 3(f))* | See Attachment C |

| | | |
|---|---|---|
| **11.** | **Documents or other property to be inspected (Art. 3(g))\***<br>*Documents ou objets à examiner (art. 3(g))* | See Attachment C |

| 12. | Any requirement that the evidence be given on oath or affirmation and any special form to be used (Art. 3(h))* *Demande de recevoir la déposition sous serment ou avec affirmation et, le cas échéant, indication de la formule à utiliser (art. 3(h))* | The testimony should be given on oath. No particular form is required. |
|---|---|---|
| 13. | Special methods or procedure to be followed (e.g., oral or in writing, verbatim transcript or summary, cross-examination, etc.) (Arts 3(i) and 9)* *Formes spéciales demandées (déposition orale ou écrite, procès-verbal sommaire ou intégral, "cross-examination", etc.) (art. 3(i) et 9)* | See Attachment D |
| 14. | Request for notification of the time and place for the execution of the Request and identity and address of any person to be notified (Art. 7)* *Demande de notification de la date et du lieu de l'exécution de la requête, de l'identité et de l'adresse de la ou des personnes à informer (art. 7)* | The Requesting Authority requests that the representatives of the parties identified on Attachment A be given advance notice of all proceedings related to execution of the letter of request by email at the addresses given on the Attachment. |
| 15. | Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request (Art. 8)* *Demande d'assistance ou de participation des magistrats de l'autorité requérante à l'exécution de la commission rogatoire (art. 8)* | Not Applicable |
| 16. | Specification of privilege or duty to refuse to give evidence under the law of the Requesting State (Art. 11(b))* *Spécification des dispenses ou interdictions de déposer prévues par la loi de l'État requérant (art. 11(b))* | The witness may refuse to give evidence if it has a privilege under the law of the United States or the law of China. Privileges under US law include the attorney-client privilege and, for natural persons, the privilege against self-incrimination. |
| 17. | The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by:* *Les taxes et frais donnant lieu à remboursement en vertu de l'article 14, alinéa 2 et de l'article 26 seront réglés par :* | The plaintiff, Unification Technologies LLC. |

| **Date of request** *Date de la requête* | |
|---|---|
| **Signature and seal of the requesting authority** *Signature et sceau de l'autorité requérante* | |

*Omit if not applicable / Ne remplir qu'en cas de nécessité*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| UNIFICATION TECHNOLOGIES LLC, | |
| Plaintiff, | Civ. A. No. 6:20-CV-500 |
| vs. | |
| MICRON TECHNOLOGY, INC., et al., | |
| Defendants | |

## ATTACHMENT A

Unification Technologies LLC ("UTL") is represented in this civil action by:

> Edward R. Nelson III
> Robert A. Delafield II
> Nelson Bumgardner Conroy PC
> 3131 West 7th St., Suite 300
> Fort Worth, Texas 76107 USA
> Email: ed@nelbum.com,  bobby@nelbum.com

> Jonathan H. Rastegar
> Nelson Bumgardner Conroy PC
> 2727 N. Harwood St., Suite 250
> Dallas, Texas 75201 USA
> Email: jon@nelbum.com

> Timothy E. Grochocinski
> Nelson Bumgardner Conroy PC
> 15020 S. Ravinia Ave., Suite 29
> Orland Park, Illinois 60462 USA
> Email : tim@nelbum.com

UTL is also represented in connection with these letters rogatory by:

> Theodore J. Folkman
> Folkman LLC
> 53 State St., Suite 500

Boston, Massachusetts 02109 USA
Email: ted@folkman.law


Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC (together, "Micron") are represented in this civil action by:

Thomas M. Melsheimer
Natalie Arbaugh
Qi Peter Tong
Winston & Strawn LLP
2121 N. Pearl St., Suite 900
Dallas, Texas 75201 USA
Email: tmelsheimer@winston.com, narbaugh@winston.com, ptong@winston.com

Katherine Vidal
Michael R. Rueckheim
Winston & Strawn LLP
275 Middlefield Rd., Suite 205
Menlo Park, CA 94025 USA
Email: kvidal@winston.com, mrueckheim@winston.com

Vivek V. Krishnan
Winston & Strawn LLP
35 W. Wacker Dr.
Chicago, Illinois 60601 USA
Email: vkrishnan@winston.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| UNIFICATION TECHNOLOGIES LLC,<br><br>Plaintiff,<br><br>vs.<br><br>MICRON TECHNOLOGY, INC., et al.,<br><br>Defendants | Civ. A. No. 6:20-CV-500 |

## ATTACHMENT B

UTL, the plaintiff in the action, is the owner of U.S. Patent Nos. 8,762,658 ("the '658 Patent"), 8,533,406 ("the '406 Patent"), and 9,632,727 ("the '727 Patent," collectively "the Patents"). The Patents, in general terms, relate to managing data on solid-state devices such as Flash memory drives in order to make certain storage functions more efficient.

UTL claims that Micron infringed its Patents in violation of Title 35, Section 271(a) of the United States Code by making, using, selling, offering for sale, or importing into the United States products that are covered by claims of the Patents. UTL claims that Micron's products, for example the Micron 5200 Series SSD, infringe the '658 Patent because they contain a non-volatile storage medium such as flash memory, a flash translation layer, and circuitry and associated software that stores data in response to receiving certain commands such as the TRIM command, such that data is stored in response to the command indicating that certain data is erased. UTL claims that Micron's products, for example the Micron Series 5200 Series SSD, infringe the '406 Patent because they utilize flash memory, a flash translation layer that maps one or more logical block addresses to physical address for certain data and contains circuitry that is configured to receive a

TRIM command that indicates and records that data stored in the 3d TLC NAND flash memory at the location specified by the logical block addresses indicated in a TRIM command has been deleted and can be erased. UTL also claims that Micron's products, for example the Micron 5200 Series SATA SSDs, infringe the '727 Patent because they include solid-state storage memory such as NAND flash memory along with a controller, a flash translation layer, and circuitry and associated software that assigns logical addresses to physical addresses used to store data on the solid-state storage memory and also removes those assignments in response to commands such as TRIM from the operating system. Micron denies these allegations and asserts several affirmative defenses. Micron has also brought several counterclaims including non-infringement, invalidity, waiver, unenforceability, and anti-trust counterclaims.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| UNIFICATION TECHNOLOGIES LLC, | |
| Plaintiff, | Civ. A. No. 6:20-CV-500 |
| vs. | |
| MICRON TECHNOLOGY, INC., et al., | |
| Defendants | |

## ATTACHMENT C

### DOCUMENTS TO BE OBTAINED

(1)     All source code used by the controllers that Memblaze Technology Co., Ltd. provided to Micron for use in the following solid state drives ("SSDs"): Micron 7300, Micron 9200, and Micron 9300 Series.

### TESTIMONY TO BE OBTAINED

This Court also requests that the appropriate judicial authorities of China order Memblaze, through an authorized representative with personal knowledge of the source code, to answer the following questions under oath, in order to authenticate the source code:

a. Is the source code that Memblaze has produced a true and correct copy of the source code that it understands is used in the controllers incorporated in the following series of Micron SSD devices: Micron 7300, Micron 9200, and Micron 9300 Series?

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| UNIFICATION TECHNOLOGIES LLC, | |
| Plaintiff, | Civ. A. No. 6:20-CV-500 |
| vs. | |
| MICRON TECHNOLOGY, INC., et al., | |
| Defendants | |

## ATTACHMENT D

This Court has entered a Protective Order in this case, which provides protections for parties or non-parties that produce confidential and proprietary information or trade secrets in the course of this litigation. A copy of the protective order is attached. The Protective Order provides specific protections for parties or non-parties producing source code. The protections are described in detail beginning at paragraph 13 of the Protective Order.

Due to difficulties of international travel during the COVID-19 pandemic, this Court requests that Memblaze be ordered to produce the source code for inspection at a place, within or outside of the People's Republic of China, to be agreed by Memblaze Technology Co., Ltd. and counsel for the parties, or failing an agreement, to be determined by the appropriate judicial authorities of China, in accordance with the procedures outlined in the Protective Order on a date to be agreed by Memblaze Technology Co., Ltd and counsel for the parties within one month of issuance of an order for production by the appropriate judicial authority of China.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| Unification Technologies LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | Civil Action No. 6:20-cv-500 |
| v. | § | |
| | § | |
| Micron Technology, Inc.; Micron | § | Jury Trial Demanded |
| Semiconductor Products, Inc.; and | § | |
| Micron Technology Texas LLC, | § | |
| | § | |
| *Defendants*. | | |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Unification Technologies LLC files this Original Complaint for patent infringement against Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC, alleging as follows:

**NATURE OF THE SUIT**

1.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

**THE PARTIES**

2.      Plaintiff **Unification Technologies LLC ("UTL")** is a Texas Limited Liability Company with its principal place of business at 6136 Frisco Square Boulevard, Suite 400, Frisco, Texas 75034.

3.      Defendant **Micron Technology, Inc. ("Micron Technology")** is a Delaware corporation with a principal place of business at 8000 South Federal Way, Boise, Idaho 83716. Micron Technology also has a place of business at 101 West Louis Henna Boulevard, Suite 210,

Austin, Texas 78728. Micron Technology is registered with the Texas Secretary of State to do business in Texas.

4.     Defendant **Micron Semiconductor Products, Inc. ("Micron Semiconductor")** is an Idaho corporation with a principal place of business at 8000 South Federal Way, Boise, Idaho 83716. Micron Semiconductor also has a place of business at 101 West Louis Henna Boulevard, Suite 210, Austin, Texas 78728. Micron Semiconductor is registered with the Texas Secretary of State to do business in Texas. Micron Semiconductor can be served through its registered agent, The Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

5.     Defendant **Micron Technology Texas, LLC ("Micron Texas", collectively "Micron")** is an Idaho Limited Liability Company with a principal place of business at 8000 South Federal Way, Boise, Idaho 83716. Micron Texas also has places of business at 101 West Louis Henna Boulevard, Suite 210, Austin, Texas 78728 and 805 Central Expressway South #100, Allen, Texas 75013. Micron Semiconductor can be served through its registered agent, The Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

6.     Micron is one of the largest memory chip makers in the world. It makes dynamic random-access memory ("DRAM"), NAND Flash, and NOR Flash memory, and other Solid-State Drive ("SSD") and controller products. Micron's products are offered under the Micron brand as well as private labels. Micron makes its own products in semiconductor fabrication plants in the United States and other countries throughout the world. Micron sells its products to customers, including customers in this District, in the computer, networking and storage, consumer electronics, solid-state drives, and mobile telecommunications markets.

7.     Micron maintains offices in Austin and Allen, Texas. Within the United States, Micron also has offices in Folsom, Irvine, Longmont, Milpitas, San Diego, and San Jose,

California; Boise and Meridian, Idaho; Minneapolis, Minnesota; Lehi, Utah; Manassas, Virginia; and Seattle, Washington.[1] Outside the United States, Micron also has offices in China, India, Japan, Korea, Malaysia, Singapore, Taiwan, Belgium, Germany, Israel, Italy, and the United Kingdom.[2]

8.      Micron operates semiconductor fabrication plants in Boise, Idaho; Lehi, Utah; and Manassas, Virginia, and fabricates and manufactures SSD products in at least Lehi, Utah and Manassas, Virginia.[3] Outside the United States, Micron operates semiconductor fabrication plants in at least China, Japan, Singapore, and Taiwan.[4]

9.      Micron operates and owns the micron.com website, and markets, offers, distributes, and provides technical support for its SSD products throughout the United States including in this District.

10.      Micron develops, designs, manufactures, distributes, markets, offers to sell, and/or sells infringing products and services within the United States, including in this District, and otherwise purposefully directs infringing activities to this District in connection with its Austin, Texas office; its micron.com website; and its other places of business in Texas and the rest of the United States.

## JURISDICTION AND VENUE

11.      This action arises under the patent laws of the United States, 35 U.S.C. § 101, *et seq.* This Court's jurisdiction over this action is proper under the above statutes, including 35

---

[1] Ex. 1, https://www.micron.com/about/locations (last visited June 3, 2020).
[2] *Id.*
[3] Ex. 2, https://en.wikipedia.org/wiki/List_of_semiconductor_fabrication_plants (last visited June 3, 2020).
[4] *Id.*

U.S.C. § 271, *et seq.*, 28 U.S.C. § 1331 (federal question jurisdiction), and § 1338 (jurisdiction over patent actions).

12.     This Court has personal jurisdiction over Defendants in accordance with due process and/or the Texas Long Arm Statute because, in part, Defendants "recruit[] Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state." Tex. Civ. Prac. & Rem. Code § 17.042(3).

13.     This Court has personal jurisdiction over Micron because Micron has engaged, and continues to engage in continuous, systematic, and substantial activities within this State, including the substantial marketing and sales of products within this State and this District. Furthermore, upon information and belief, this Court has personal jurisdiction over Micron because Micron has committed acts giving rise to UTL's claims for patent infringement within and directed to this District.

14.     For example, Micron is subject to personal jurisdiction in this Court because, *inter alia*, it has regular and established places of business in this District, including offices located at 101 West Louis Henna Boulevard, Suite 210, Austin, Texas 78728.[5] The Travis County Central Appraisal District (CAD) website [6] indicates that both Micron Technology and Micron Semiconductor own the property at 101 West Louis Henna Boulevard, Suite 210, Austin, Texas 78664 and that it is appraised at more than $2 million.[7]

---

[5] Ex 3, https://www.micron.com/about/locations?country=USA&city=Austin (last visited June 3, 2020).

[6] Ex 4, http://propaccess.traviscad.org/clientdb/?cid=1 (last visited June 3, 2020).

[7] Ex 5, http://propaccess.traviscad.org/clientdb/Property.aspx?prop_id=874673 (last visited June 3, 2020) (property record for Micron Technology); Ex 6, http://propaccess.traviscad.org/clientdb/Property.aspx?prop_id=926072 (last visited June 3, 2020) (property record for Micron Semiconductor).

15.     Micron's Austin offices are regular and established places of business at least because these locations include many members of Micron's important teams, including storage system architects, SPME system architects, storage system engineers, storage solutions engineers, and software engineers. Micron posts job openings for its Allen office[8], and as of June 3, 2020, Micron was posting two job openings for its Allen office and Austin office that were available or recently filled.[9] These and additional job postings can be found on Monster.com and various other websites.[10]

16.     Based on publicly available information, since 2016, Micron Technology has been the employer of approximately twenty recipients of H-1B visas who work and reside in the Austin, Texas area.[11] Micron Semiconductor has been the employer of at least two recipients of H-1B visas who work and reside in the Austin, Texas area.[12] Additionally, Micron Technology has been the employer of approximately sixteen recipients of H-1B visas who work and reside in the Allen, Texas area.[13]

17.     Micron, directly and through its agents, regularly conducts, solicits, and transacts business in this District and elsewhere in Texas, including through its micron.com website. For

---

[8] Ex 7, https://jobs.micron.com/search/?createNewAlert=false&q=&locationsearch=Texas (last visited June 3, 2020).
[9] *Id*.
[10] Ex. 8, https://www.monster.com/jobs/search/?cn=micron&where=texas&intcid=skr_navigation_nhpso_searchCompany (last visited June 3, 2020).
[11] Ex. 9, https://h1bdata.info/index.php?em=Micron+Technology&job=&city=Austin&year=All+Years (last visited June 3, 2020).
[12] Ex. 10, https://h1bdata.info/index.php?em=Micron+Semiconductor&job=&city=Austin&year=All+Years (last visited June 3, 2020).
[13] Ex. 11. https://h1bdata.info/index.php?em=Micron+Technology&job=&city=Allen&year=All+Years (last visited June 3, 2020).

example, Micron employs sales and marketing employees that regularly sell, offer to sell, or otherwise distribute SSD products in this District and elsewhere in Texas.

18.     In particular, Micron has committed and continues to commit acts of infringement in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, and sold infringing products in Texas, including in this District, and engaged in infringing conduct within and directed at or from this District. The infringing SSD products have been and continue to be distributed to and used in this District. Micron's acts cause injury to UTL, including injury suffered within this District.

19.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Micron has committed acts of infringement in this District and has a regular and established place of business in this District.

20.     Specifically, Micron Technology, Micron Semiconductor, and Micron Texas have regular and established places of business located at 101 West Louis Henna, Boulevard, Suite 210, Austin, Texas 78728. Furthermore, Micron Technology, Micron Semiconductor, and Micron Texas are all registered to do business in Texas.

21.     Micron Semiconductor and Micron Texas are wholly owned subsidiaries of Micron Technology. Micron Technology does not separately report revenue from Micron Semiconductor or Micron Texas in its filings to the Securities and Exchange Commission (SEC), but rather reports combined revenue from its various products and subsidiaries.

22.     On information and belief, Micron Technology owns and operates Micron Semiconductor and Micron Texas, including the cooperative development, improvement, and support of Micron's products and services.

## THE PATENTS-IN-SUIT

23.     This cause of action asserts infringement of United States Patent Nos. 8,762,658 ("the '658 Patent"); 8,533,406 ("the '406 Patent"); and 9,632,727 ("the '727 Patent") (collectively, the "Patents-in-Suit").

24.     The inventions disclosed in the Patents-in-Suit are a valuable contribution to the SSD product industry. In fact, several major SSD market competitors have already taken licenses to the Patents-in-Suit, including Intel Corp., Google, LLC, Samsung Electronics America, Inc., SK Hynix, Inc., Western Digital, Inc., Toshiba America, Inc. and e.Digital Corp.

25.     The '658 Patent, entitled "Systems and Methods For Persistent Deallocation," duly and legally issued on June 24, 2014, from U.S. Patent Application No. 13/566,471, filed on August 3, 2012, naming David Flynn, Jonathan Thatcher, and Michael Zappe as the inventors. A true and correct copy of the '658 Patent is attached hereto as **Exhibit 12** and is incorporated by reference.

26.     The '658 Patent is a continuation of U.S. Patent No. 8,261,005.

27.     The '658 Patent claims patent-eligible subject matter under 35 U.S.C. § 101.

28.     Plaintiff UTL is the owner and assignee of all rights, title, and interest in and under the '658 Patent.

29.     Assignments of the '658 Patent reflective of its chain-of-title are recorded at the USPTO at Reel 028800, Frame 0340; Reel 028802 Frame 0131; Reel 033389 Frame 0511; Reel 033419 Frame 0748; Reel 033410 Frame 0158; Reel 038362 Frame 0604; Reel 038362 Frame 0575; Reel 038748 Frame 0880; Reel 047702 Frame 0413; Reel 048918 Frame 0035; Reel 052095 Frame 0903; and Reel 052096 Frame 0225.

30.     UTL has standing to sue for infringement of the '658 Patent.

31.     The '406 Patent, entitled "Apparatus, System, and Method For Identifying Data That Is No Longer In Use," duly and legally issued on September 10, 2013, from U.S. Patent Application No. 13/607,486, filed on September 7, 2012, naming David Flynn, Jonathan Thatcher, and Michael Zappe as the inventors. A true and correct copy of the '406 Patent is attached hereto as **Exhibit 13** and is incorporated by reference.

32.     The '406 Patent is a continuation of the '658 Patent.

33.     The '406 Patent claims patent-eligible subject matter under 35 U.S.C. § 101.

34.     Plaintiff UTL is the owner and assignee of all rights, title, and interest in and under the '406 Patent.

35.     Assignments of the '406 Patent reflective of its chain-of-title are recorded at the USPTO at Reel 029015, Frame 0181; Reel 029033 Frame 0133; Reel 033389 Frame 0511; Reel 033419 Frame 0748; Reel 033410 Frame 0158; Reel 038362 Frame 0604; Reel 038362 Frame 0575; Reel 038748 Frame 0880; Reel 047702 Frame 0413; Reel 048918 Frame 0035; Reel 052095 Frame 0903; and Reel 052096 Frame 0225.

36.     UTL has standing to sue for infringement of the '406 Patent.

37.     The '727 Patent, entitled "Systems and Methods For Identifying Storage Resources That Are Not In Use," duly and legally issued on April 25, 2017, from U.S. Patent Application No. 14/309,751, filed on June 19, 2014, naming David Flynn, Jonathan Thatcher, and Michael Zappe as the inventors. A true and correct copy of the '727 Patent is attached hereto as **Exhibit 14** and is incorporated by reference.

38.     The '727 Patent is a continuation of the '658 Patent.

39.     The '727 Patent claims patent-eligible subject matter under 35 U.S.C. § 101.

40.     Plaintiff UTL is the owner and assignee of all rights, title, and interest in and under the '727 Patent.

41.     Assignments of the '727 Patent reflective of its chain-of-title are recorded at the USPTO at Reel 033389 Frame 0511; Reel 033419 Frame 0748; Reel 033410 Frame 0158; Reel 038362 Frame 0604; Reel 038362 Frame 0575; Reel 038748 Frame 0880; Reel 047702 Frame 0413; Reel 048918 Frame 0035; Reel 052095 Frame 0903; and Reel 052096 Frame 0225.

42.     UTL has standing to sue for infringement of the '727 Patent.

43.     Micron has not obtained a license to any of the Patents-in-Suit.

44.     Micron does not have UTL's permission to make, use, sell, offer to sell, or import products that are covered by one or more claims of any of the Patents-in-Suit.

45.     Micron requires a license to the Patents-in-Suit and otherwise needs to cease its ongoing infringement of UTL's patent rights.

## GENERAL ALLEGATIONS

46.     Upon information and belief, Micron makes, uses, sells, offers to sell, and/or imports into the United States many types of SSD devices as claimed in each of the Patents-in-Suit. For example, Defendants make, use, sell, offer to sell, and/or import into the United States the Micron 5200 Series SATA NAND Flash SSD.

47.     Micron has infringed and continues to infringe (literally and/or under the doctrine of equivalents), directly, indirectly, and/or through subsidiaries, agents, representatives, or intermediaries, one or more claims of each of the Patents-in-Suit by making, using, importing, testing, supplying, causing to be supplied, selling, and/or offering for sale in the United States Micron's SSD products.

48.     Micron has knowledge of the Patents-in-Suit at least as of the filing of this lawsuit.

49.     Further discovery may reveal earlier knowledge of one or more of the Patents-in-Suit, which would provide additional evidence of Micron's specific intent and/or willful blindness with respect to infringement.

50.     UTL has been and continues to be damaged because of Micron's infringing conduct. Micron is therefore liable to UTL in an amount that adequately compensates UTL for Micron's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

51.     Micron markets and sells other products that are not covered by the claims of the Patents-in-Suit but that are sold with or in conjunction with Micron's SSD products. Accordingly, UTL is entitled to collect damages from Micron for convoyed sales of certain non-patented items.

52.     Defendants failed to obtain permission from UTL to make, use, sell, offer to sell, or import products incorporating the inventions claimed in the Patents-in-Suit.

53.     Attached to this Complaint are **Exhibits 15-17**, which are sample claim charts and are incorporated by reference herein.

54.     For each count of infringement listed below, UTL incorporates and re-states the allegations contained in the preceding paragraphs above including these General Allegations as if fully set forth in each count of infringement.

## <u>COUNT I – INFRINGEMENT OF THE '658 PATENT</u>

55.     UTL incorporates herein the allegations made in paragraphs 1–54.

56.     Micron has been and is now directly infringing the '658 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States products that are covered by at least Claim 1 of the '658 Patent.

57.     Micron makes, has made, uses, sells, offers to sell, and/or imports Micron SSD products that contain a non-volatile storage medium such as Flash memory, a flash translation layer as well as circuitry and associated software that stores data in response to receiving certain commands such as the TRIM command such that data is stored in response to said command indicating that certain data is erased. These products infringe at least Claim 1 of the '658 Patent.

58.     For example, Micron makes, has made, uses, sells, offers to sell, and/or imports the Micron 5200 Series SSD. The Micron 5200 Series SSD contains NAND Flash memory, a flash translation layer, and circuitry and associated software that stores data in response to receiving a TRIM command such that data is stored in response to said command indicating that certain data is erased. The Micron 5200 Series SSD infringes at least Claim 1 of the '658 Patent.

59.     An exemplary claim chart comparing Micron's infringing Micron 5200 Series SSDs to Claim 1 of the '658 Patent is attached as **Exhibit 15** and incorporated herein by reference. This is only a non-limiting example. Many of Micron's other SSD products that utilize the same or similar Flash memory, flash translation table, and circuitry and associated software that store data in response to receiving a command such as the TRIM command such that data is stored in response to said command indicating that certain data is erased, also infringe at least claim 1 of the '658 Patent.

60.     Micron has actual knowledge of the '658 Patent at least since the filing of this lawsuit.

61.     As a result of Micron's infringement of the '658 Patent, UTL has suffered and is owed monetary damages that are adequate to compensate it for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

## COUNT II – INFRINGEMENT OF THE '406 PATENT

62.     UTL incorporates herein the allegations made in paragraphs 1–61.

63.     Micron has been and is now directly infringing the '406 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States products that are covered by at least Claim 15 of the '406 Patent.

64.     Micron makes, has made, uses, sells, offers to sell, and/or imports Micron SSD products that include a request receiver module configured to receive information that data has been deleted, and a marking module to record that data can then be erased. These products infringe at least Claim 15 of the '406 Patent.

65.     Many of Micron's SSD products – that utilize Flash memory, a flash translation layer that maps one or more logical block addresses ("LBAs") to physical addresses for certain data, and contains circuitry that is configured to receive a TRIM command that indicates and records that data stored in the 3D TLC NAND Flash memory at the locations specified by the LBAs indicated in a TRIM command has been deleted and can be erased – infringe at least Claim 15 of the '406 Patent.

66.     For example, Micron makes, has made, uses, sells, offers to sell, and/or imports the Micron 5200 Series SSD. The Micron 5200 Series SSD is an apparatus utilizes NAND Flash memory, a flash translation layer that maps one or more LBAs to physical addresses for certain data, and contains circuitry that is configured to receive a TRIM command.  The Micron 5200 Series SSD then indicates and records that data stored in the NAND Flash memory at the locations specified by the LBAs indicated in a TRIM command has been deleted and can be erased. The Micron 5200 Series SSD infringes at least Claim 15 of the '406 Patent.

67.     An exemplary claim chart comparing Micron's infringing Micron 5200 Series SSDs to Claim 15 of the '406 Patent is attached as **Exhibit 16** and incorporated herein by reference.

This is only a non-limiting example. Many of Micron's other SSD products that utilize the same or similar Flash memory, flash translation layer, and circuitry configured to receive a TRIM command also infringe at least Claim 15 of the '406 Patent.

68.     Micron has actual knowledge of the '406 Patent at least since the filing of this lawsuit.

69.     As a result of Micron's infringement of the '406 Patent, UTL has suffered and is owed monetary damages that are adequate to compensate it for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

## <u>COUNT III – INFRINGEMENT OF THE '727 PATENT</u>

70.     UTL incorporates herein the allegations made in paragraphs 1–69.

71.     Micron has been and is now directly infringing the '727  Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States products that are covered by at least Claim 1 of the '727 Patent.

72.     Micron makes, has made, uses, sells, offers to sell, and/or imports  SSD products that include solid-state storage memory such as NAND Flash memory along with a controller, a flash translation layer, and circuitry and associated software that assigns logical addresses to physical addresses used to store data on the solid-state storage memory and also removes those assignments in response to commands such as TRIM from the operating system. These products infringe at least Claim 1 of the '727 Patent.

73.     For example, Micron makes, has made, uses, sells, offers to sell, and/or imports the Micron 5200 Series SATA SSDs. These SSDs include solid-state storage memory such as NAND Flash memory along with a controller, a flash translation layer, and circuitry and associated software that assigns logical addresses to physical addresses used to store data on the solid-state

storage memory and also removes those assignments in response to commands such as TRIM from the operating system. These Micron SSD products infringe at least Claim 1 of the '727 Patent.

74. An exemplary claim chart comparing Micron's infringing Micron 5200 Series SSD to Claim 1 of the '727 Patent is attached as **Exhibit 17** and incorporated herein by reference. This is only a non-limiting example. Many of Micron's other SSD products that incorporate Flash memory with a controller, a flash translation layer, and circuitry and associated software that assigns logical addresses to physical addresses used to store data and also removes those assignments in response to certain commands such as the TRIM command also infringe at least Claim 1 of the '727 Patent.

75. Micron has actual knowledge of the '727 Patent at least since the filing of this lawsuit.

76. As a result of Micron's infringement of the '727 Patent, UTL has suffered and is owed monetary damages that are adequate to compensate it for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

## DEMAND FOR A JURY TRIAL

77. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, UTL demands a trial by jury on all issues triable of right by a jury.

## PRAYER FOR RELIEF

78. UTL respectfully requests that this Court enter judgment in its favor and grant the following relief:

(i) Judgment that Micron has directly and/or indirectly infringed one or more claims of each of the Patents-in-Suit;

(ii)     Judgment and Order that Micron must to pay UTL past and future damages under 35 U.S.C. § 284, including supplemental damages arising from any continuing post-verdict infringement for the time between trial and entry of the final judgment, together with an accounting, as needed, as provided under 35 U.S.C. § 284;

(iii)    Judgment and Order that Micron must pay UTL reasonable ongoing royalties on a go-forward basis after final judgment;

(iv)    Judgment and Order that Micron must pay UTL pre-judgment and post-judgment interest on the damages award;

(v)     Judgment and Order that Micron must pay UTL's costs; and

(vi)    Such other and further relief as the Court may deem just and proper.

Dated: June 5, 2020                              Respectfully submitted,

/s/ Edward Nelson III
**BARRY J. BUMGARDNER (PRO HAC TO FOLLOW)**
STATE BAR NO. 00793424
**EDWARD NELSON III**
STATE BAR NO. 00797142
**MATTHEW JUREN (PRO HAC TO FOLLOW)**
STATE BAR NO. 24065530
**ROBERT A. DELAFIELD II**
STATE BAR NO. 24065137
**NELSON BUMGARDNER ALBRITTON PC**
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
817.377.9111 (telephone)
903.758.7397 (facsimile)
barry@nbafirm.com
ed@nbafirm.com

matthew@nbafirm.com
bobby@nbafirm.com

**COUNSEL FOR PLAINTIFF**
**UNIFICATION TECHNOLOGIES LLC**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

UNIFICATION TECHNOLOGIES LLC,

     Plaintiff,

     v.

MICRON TECHNOLOGY, INC.;
MICRON SEMICONDUCTOR
PRODUCTS, INC.; MICRON
TECHNOLOGY TEXAS, LLC,

     Defendants.

Civil Action No. 6:20-CV-500-ADA

## DEFENDANTS' FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT

Defendants Micron Technology, Inc.; Micron Semiconductor Products, Inc.; and Micron Technology Texas, LLC ("Micron" or "Defendants") submit this First Amended Answer, Affirmative Defenses, and Counterclaims in response to Plaintiff Unification Technologies LLC's ("UTL" or "Plaintiff") Complaint.

The numbered paragraphs below correspond to the numbered paragraphs in the Complaint and constitute Defendants' responsive admissions, denials, and allegations thereto.  Except as Defendants otherwise admit expressly below, Defendants deny each and every allegation contained in the Complaint, including, without limitation, the headings, subheadings, footnotes, diagrams, and tables contained in the Complaint.

Defendants reserve the right to amend or supplement their First Amended Answer and Affirmative Defenses.

## NATURE OF THE SUIT

1.     Micron admits that the Complaint purports to be a civil action for infringement

under the patent laws of the United States, but denies any liability related to the Complaint.  Except as expressly admitted, Micron denies the remaining allegations in paragraph 1.

## THE PARTIES

2.      Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 2 of the Complaint and therefore denies the same.

3.      Micron Technology, Inc. ("MTI") admits that it is a Delaware corporation with a principal place of business at 8000 South Federal Way, Boise, Idaho 83716.  Except as expressly admitted, Micron denies the remaining allegations in paragraph 3.

4.      Micron Semiconductor Products, Inc. ("MSP") admits that it is an Idaho corporation with a principal place of business at 8000 South Federal Way, Boise, Idaho 83716. MSP admits that it leases a property located at 101 West Louis Henna Boulevard, Suite 210, Austin, Texas 78728.  MSP admits that it is registered to do business in Texas.  MSP admits that it can be served with certain process through its registered agent for service of process, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.  Except as expressly admitted, Micron denies the remaining allegations in paragraph 4.

5.      Micron Technology Texas, LLC ("Micron Texas") admits that it is an Idaho limited liability company with a place of business at 8000 South Federal Way, Boise, Idaho 83716.  Micron Texas admits that it has a place of business at 805 Central Expressway South, Suite 100, Allen, Texas 75013.  Micron Texas admits that it can be served with certain process through its registered agent for service of process, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.  Except as expressly admitted, Micron denies the remaining allegations in paragraph 5 of the Complaint.

6.      Micron denies the allegations of paragraph 6.

7.      Micron denies the allegations of paragraph 7.

8.      Micron denies the allegations of paragraph 8.

9.      Micron denies the allegations of paragraph 9.

10.     Micron denies the allegations of paragraph 10.

## JURISDICTION

11.     Paragraph 11 contains conclusions of law and not averments of fact to which the rules require an answer, but insofar as the rules require an answer, Micron admits that the Complaint purports to assert an action under the patent laws of the United States, 35 U.S.C. § 271 *et seq.*, and that this Court has subject matter jurisdiction over actions for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

12.     Based solely on the allegations in the Complaint, and assuming (without admitting) them to be true, Micron does not contest personal jurisdiction in this district in this case.  Except as expressly admitted, Micron denies the remaining allegations in paragraph 12.

13.     Micron denies the allegations of paragraph 13.

14.     Micron denies the allegations of paragraph 14.

15.     Micron denies the allegations of paragraph 15.

16.     Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore denies the same.

17.     Micron denies the allegations of paragraph 17.

18.     Micron denies the allegations of paragraph 18.

19.     Micron denies the allegations of paragraph 19.

20.     Micron denies the allegations of paragraph 20.

21.     Micron admits that MSP and Micron Texas are wholly owned subsidiaries of MTI. Micron admits that MTI currently does not separately report revenue from MSP or Micron Texas in its public filings submitted to the Securities and Exchange Commission. Except as expressly

admitted, Micron denies the remaining allegations in paragraph 21.

22.     Micron denies the allegations of paragraph 22.

## FACTUAL BACKGROUND

23.     Paragraph 23 contains conclusions of law and not averments of fact to which the rules require an answer, but insofar as the rules require an answer, Micron admits that the Complaint purports to assert an action of infringement of United States Patent Nos. 8,762,658 ("the '658 Patent"); 8,533,406 ("the '406 Patent"); and 9,632,727 ("the '727 Patent") (collectively, the "Patents-in-Suit").

24.     Micron denies that the subject matter recited in the claims of the Patents-in-Suit are a valuable contribution to the SSD product industry.  Micron lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 24 of the Complaint and therefore denies the same.

25.     Micron admits that, according to the face of the document, the '658 Patent is entitled "Systems and Methods For Persistent Deallocation" and was issued on June 24, 2014, from U.S. Patent Application No. 13/566,471, filed on August 3, 2012, naming David Flynn, Jonathan Thatcher, and Michael Zappe as the inventors.  Micron admits that Exhibit 12 attached to the Complaint purports to be a copy of the '658 Patent.  Except as expressly admitted, Micron denies the remaining allegations in paragraph 25.

26.     Micron admits that, according to the face of the document, the '658 Patent is a continuation of U.S. Patent No. 8,261,005.  Micron lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 26 of the Complaint and therefore denies the same.

27.     Micron denies the allegations in paragraph 27.

28.     Micron lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 28 of the Complaint and therefore denies the same.

29.     Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 29 of the Complaint and therefore denies the same.

30.     Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 30 of the Complaint and therefore denies the same.

31.     Micron admits that, according to the face of the document, the '406 Patent is entitled "Apparatus, System, and Method For Identifying Data That Is No Longer In Use" and was issued on September 10, 2013, from U.S. Patent Application No. 13/607,486, filed on September 7, 2012, naming David Flynn, Jonathan Thatcher, and Michael Zappe as the inventors.  Micron admits that Exhibit 13 attached to the Complaint purports to be a copy of the '406 Patent.  Except as expressly admitted, Micron denies the remaining allegations in paragraph 31.

32.     Micron admits that, according to the face of the document, the '406 Patent is a continuation of the '658 Patent.  Micron lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 32 of the Complaint and therefore denies the same.

33.     Micron denies the allegations of paragraph 33.

34.     Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 34 of the Complaint and therefore denies the same.

35.     Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 35 of the Complaint and therefore denies the same.

36.     Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 36 of the Complaint and therefore denies the same.

37.     Micron admits that, according to the face of the document, the '727 Patent is

entitled "Systems and Methods For Identifying Storage Resources That Are Not In Use" and was issued on April 25, 2017, from U.S. Patent Application No. 14/309,751, filed on June 19, 2014, naming David Flynn, Jonathan Thatcher, and Michael Zappe as the inventors.  Micron admits that Exhibit 14 attached to the Complaint purports to be a copy of the '727 Patent.  Except as expressly admitted, Micron denies the remaining allegations in paragraph 37.

38.     Micron admits that, according to the face of the document, the '727 Patent is a continuation of the '658 Patent.  Micron lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 38 of the Complaint and therefore denies the same.

39.     Micron denies the allegations of paragraph 39.

40.     Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 40 of the Complaint and therefore denies the same.

41.     Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 41 of the Complaint and therefore denies the same.

42.     Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 42 of the Complaint and therefore denies the same.

43.     Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 43 of the Complaint and therefore denies the same.

44.     Micron denies that it makes, uses, sells, offers to sell, or imports products that are covered by one or more valid and enforceable claims of any of the Patents-in-Suit.  Micron lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 44 of the Complaint and therefore denies the same.

45.     Micron denies the allegations of paragraph 45.

**GENERAL ALLEGATIONS**

46.     Micron denies the allegations in paragraph 46.

47.     Micron denies the allegations in paragraph 47.

48.     Micron admits that the Patents-in-Suit were identified in the Complaint when the above-captioned litigation was filed.  Micron denies the remaining allegations in paragraph 48.

49.     Micron denies the allegations in paragraph 49.

50.     Micron denies the allegations in paragraph 50.

51.     Micron denies the allegations in paragraph 51.

52.     Micron denies that it makes, uses, sells, offers to sell, or imports products that are covered by one or more valid and enforceable claims of any of the Patents-in-Suit.  Micron denies the allegations in paragraph 52.

53.     Micron admits that Exhibits 15-17 attached to the Complaint purport to be sample claim charts.

54.     For each alleged count of infringement listed below, Micron incorporates and re-states by reference its responses to the allegations contained in the preceding paragraphs above including the responses to the General Allegations of the Complaint as if fully set forth in each alleged count of infringement.

**COUNT I: ALLEGED INFRINGEMENT OF THE '658 PATENT**

55.     Micron repeats and incorporates by reference its responses to the allegations of paragraphs 1-54 of the Complaint as if fully set forth herein.

56.     Micron denies the allegations in paragraph 56.

57.     Micron denies the allegations in paragraph 57.

58.     Micron denies the allegations in paragraph 58.

59.     Micron denies the allegations in paragraph 59.

7

60.     Micron admits that the '658 Patent was identified in the Complaint when the above-captioned litigation was filed.  Micron denies the remaining allegations in paragraph 60.

61.     Micron denies the allegations in paragraph 61.

**COUNT II: ALLEGED INFRINGEMENT OF THE '406 PATENT**

62.     Micron repeats and incorporates by reference its responses to the allegations of paragraphs 1-61 of the Complaint as if fully set forth herein.

63.     Micron denies the allegations in paragraph 63.

64.     Micron denies the allegations in paragraph 64.

65.     Micron denies the allegations in paragraph 65.

66.     Micron denies the allegations in paragraph 66.

67.     Micron denies the allegations in paragraph 67.

68.     Micron admits that the '406 Patent was identified in the Complaint when the above-captioned litigation was filed.  Micron denies the remaining allegations in paragraph 68.

69.     Micron denies the allegations in paragraph 69.

**COUNT III: ALLEGED INFRINGEMENT OF THE '727 PATENT**

70.     Micron repeats and incorporates by reference its responses to the allegations of paragraphs 1-69 of the Complaint as if fully set forth herein.

71.     Micron denies the allegations in paragraph 71.

72.     Micron denies the allegations in paragraph 72.

73.     Micron denies the allegations in paragraph 73.

74.     Micron denies the allegations in paragraph 74.

75.     Micron admits that the '727 Patent was identified in the Complaint when the above-captioned litigation was filed.  Micron denies the remaining allegations in paragraph 75.

76.     Micron denies the allegations in paragraph 76.

## DEMAND FOR A JURY TRIAL

77.     Micron admits that the Complaint purports to demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

78.     Micron denies that UTL is entitled to any relief in this action, as requested in paragraphs (i)-(vi) of UTL's Prayer for Relief or otherwise.

## MICRON'S AFFIRMATIVE DEFENSES

Subject to its responses above, and upon information and belief, Micron alleges and asserts these defenses in response to the allegations in the Complaint, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated.  In addition to the affirmative defenses described below, subject to the responses above, Micron reserves all rights to allege additional defenses pursuant to any scheduling order, that become known through the course of discovery, or otherwise.

## FIRST AFFIRMATIVE DEFENSE – FAILURE TO STATE A CLAIM

1.     UTL has failed to plead its claims with sufficient specificity or factual support to place Micron on notice of the claims UTL is asserting against it, such that UTL has failed to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE – NON-INFRINGEMENT

2.     Micron has not infringed and does not infringe (i) directly, either literally or under the doctrine of equivalents, (ii) indirectly by contributing to infringement by others, either literally or under the doctrine of equivalents, and/or (iii) indirectly by inducing others to infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the Patents-in-Suit, willfully or otherwise.

## THIRD AFFIRMATIVE DEFENSE – INVALIDITY

3. One or more claims of the Patents-in-Suit are invalid for failure to meet the conditions of patentability and/or otherwise comply with the requirements of 35 U.S.C. §§ 101 *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112.

## FOURTH AFFIRMATIVE DEFENSE – PROSECUTION HISTORY ESTOPPEL

4. One or more claims are limited by the text of the Patents-in-Suit and prosecution histories of the Patents-in-Suit and related patents such that UTL is estopped, or otherwise precluded, from asserting that the claim is infringed by Micron, literally or by equivalents.

## FIFTH AFFIRMATIVE DEFENSE – WAIVER AND ESTOPPEL

5. UTL's claims for relief, in whole or in part, are barred by the doctrines of waiver and/or estoppel.  UTL's predecessor-in-interest engaged in standards-setting misconduct, including, without limitation, breach of a Patent Policy requiring disclosure of patents.

6. UTL's predecessor Fusion Multisystems, Inc., DBA Fusion-io and/or Fusion-io, Inc. (collectively, "Fusion-io") is recorded as the first assignee of the Patents-in-Suit.  On information and belief, the named inventors worked for Fusion-io.

7. During the prosecution of the Patents-in-Suit and/or the applications from which the Patents-in-Suit purport to claim priority, Fusion-io participated as a member in Technical Committee T10 of the American National Standards Institute ("ANSI").  *E.g.*, Ex. A; Ex. B.

8. T10 is a Technical Committee of the InterNational Committee on Information Technology Standards ("INCITS").  INCITS is accredited by, and operates under rules that are approved by, the ANSI.  T10 is responsible for the SCSI standard.[1]

9. On information and belief, to join T10, Fusion-io agreed to abide by T10's patent

---

[1] INCITS Technical Committee T10, *Introduction to T10*, https://www.t10.org/intro.htm (last updated Jul. 21, 2016).

policy and ANSI's patent policies.  As a T10 and ANSI member, Fusion-io had an obligation and/or

a duty to comply with ANSI patent policies, including the T10 Patent Policy, available at

https://www.t10.org/patpol.htm.  On information and belief, the T10 Patent Policy has stated, since

July 30, 2007:

| Home | Projects | Drafts | Publications | Reflector | Email archives | Recent uploads |
|------|----------|--------|--------------|-----------|----------------|----------------|
| About T10 | Meetings | Documents | Lookup doc: | | Members | Patents & procedures |
| Links | Minutes | Search docs | | | Editors page | Vendor ID & codes |

# Patent Policy Summary

In support of the patent policy of ANSI, the chairman of each TC/TG is required to solicit submissions from those parties who hold patents (U.S. or foreign) that have been granted or are under application and who feel that such patents cover technology described in a standard that is under development or has been approved.

The request is that any such party submit a letter which will be kept on file at ANSI's Standards office. These letters will be made available to any party upon request. We ask assurance that any granted patent will follow the ANSI patent policy.

*"In particular, the identified party or patent holder must supply ANSI with either:*

- *a general disclaimer to the effect that such party does not hold and does not currently intend holding any invention the use of which would be required for compliance with the proposed standard*

*or*

- *a written assurance that either:*

1. *a license will be made available without compensation to applicants desiring to utilize the license for the purpose of implementing the standard,*

   *or*

2. *a license will be made available to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination"*

The submitter should feel free to include any other information that they wish to communicate in such a letter that will be available on a long-term basis.

The letter should be addressed and submitted to the TC/TG Chair and signed by a responsible party that holds or will hold assignment rights to the patent.

(This page was last updated 2007/07/30.)

[Return to the T10 home page.]

For more information on T10 or if you have comments on this page contact the T10 Officers

10.     As pled in more detail below, Fusion-io knew it held patents or applications

covering technology described in a standard that was under development or had been approved

and, thus, under this Policy was required to disclose those patents or applications.

11.     During the prosecution of parent application 11/952,113 (Patent No.  8,261,005) from which the Patents-in-Suit claim priority, Fusion-io filed an Information Disclosure Statement on May 29, 2012, listing, as reference C48, Data Set Management Commands Proposal for ATA8-ACS2, third revision, published October 5, 2007.  Ex. C at 10.

| | | | |
|---|---|---|---|
| | C48 | MICROSOFT, "Data Set Management Commands Proposal for ATA8-ACS2, published October 5, 2007, Rev. 3 | |

*Id.*  Frank Shu submitted this proposal promoting the adoption of the TRIM command into the ATA standard.

12.     On or about July 22, 2014, Fusion-io assigned rights to Intellectual Property Holdings 2 LLC, a Delaware limited liability company, as recorded in the USPTO Assignment Database at reel 033389, frames 0511-0538.  Ex. D at 1, 5.

13.     In the assignment, Fusion-io assigned the '658 Patent, the '406 Patent, application 14/309,751 (which would later issue as the '727 Patent), and other patents and applications to Intellectual Property Holdings 2 LLC.  Ex. D.

14.     On frame 0524 of the assignment, Fusion-io noted its belief that the '658 Patent related to "PTRIM," believed to refer to "Persistent TRIM," and that the '406 Patent related to "TRIM."  *Id.* at 14.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| US | PTRIM, APPARATUS, SYSTEM, AND METHOD FOR MANAGING DATA IN A STORAGE DEVICE WITH AN EMPTY DATA TOKEN DIRECTIVE | Issued | 13566471 | 8/3/2012 | 2.01E+10 | 12/27/2012 | 8762658 | 6/24/2014 |
| US | ASMF MANAGING DATA USING A DATA PIPELINE TRIM ASMF | Issued | 13600077 | 8/30/2012 | US 2012-0324311 | 12/20/2012 | 8533569 | 9/10/2013 |
| US | Identifying Data that is No Longer in Use | Issued | 13607486 | 9/7/2012 | 2.01E+10 | 1/24/2013 | 8533406 | 9/10/2013 |

15.     On frame 0524 of the assignment, Fusion-io also noted its belief that application 14/309,751, which ultimately issued as the '727 Patent, related to "TRIM." *Id.*

| | | | | | |
|---|---|---|---|---|---|
| US | TRIM ASMF MANAGING DATA IN A STORAGE DEVICE WITH AN EMPTY DATA TOKEN DIRECTIVE | Pending | | 14309751 | 6/19/2014 |

16.     At the time of these acknowledgments by Fusion-io, the TRIM command qualified as a "technology described in a standard that is under development" in T10 per the T10 Patent Policy.  T10 named its version of the TRIM command "UNMAP."  *E.g.*, Ex. E at 1 ("The UNMAP command can be directly translated to the ATA DATA SET MANAGEMENT command with the TRIM bit set to one.")

17.     On information and belief, Fusion-io knew about both UNMAP and TRIM, and promoted the UNMAP equivalent of the TRIM command for adoption by T10.

18.     On information and belief, Fusion-io knew about the T10 Patent Policy, which is regularly presented at general T10 meetings.

19.     On January 13, 2012, Fusion-io partially complied with the T10 Patent Policy but failed to provide full disclosure as required.  Fusion-io provided a Patent Declaration that related only to "Atomic Writes."  Ex. B.  But this January 13, 2012 Patent Declaration said nothing about Fusion-io's patent family that Fusion-io knew was related to "TRIM" or "PTRIM," and the Patent Declaration made no mention of the pending application where Fusion-io cited Data Set Management Commands Proposal for ATA8-ACS2.  *Id.*  On information and belief, Fusion-io provided no other patent declaration to T10.

20.     By failing to notify T10 about the patents and applications that it knew to be related to TRIM and UNMAP, Fusion-io failed to fulfill its duty of notification, and/or intentionally

withheld this information and committed fraud.  Fusion-io intended to mislead T10, other ANSI committees, including T13, and the general public by withholding a disclosure regarding the pending Patents-in-Suit in violation of the T10 Patent Policy.

21.     Due to Fusion-io's actions, T10 and T13 incorporated the UNMAP and TRIM commands into their respective SCSI/ATA standards.  Also, NVM Express later incorporated its DEALLOCATE command into the NVMe Standard modeled on the UNMAP and TRIM commands.  T10, T13, NVM Express, and the general public (including Micron) using these SCSI/ATA/NVMe standards reasonably relied on Fusion-io's absence of TRIM-related Patent Declarations in deciding to incorporate and/or use the UNMAP, TRIM, and DEALLOCATE commands or make products using these commands in compliance with the industry standards.

22.     Fusion-io's actions unfairly prejudices T10, T13, NVM Express, and the general public who develop products that relate to these standards.  These standard-setting organizations adopted the UNMAP, TRIM, or DEALLOCATE commands through a long and complicated standard-setting process.   Fusion-io unfairly prejudiced T10, T13, NVM Express, and SCSI/SATA/NVMe product developers by waiting until after widespread adoption of the standards to reveal its ownership of the Patents-in-Suit and assert infringement because changing the accused commands in the standards and/or modifying products relating to these standards became difficult and/or impractical to coordinate after widespread adoption.

23.     Had Fusion-io complied with the T10 Patent Policy and disclosed that it owned patents related to "TRIM" or "PTRIM," then T10, T13, and NVM Express would not have adopted the UNMAP, TRIM, or DEALLOCATE commands in their current forms, at least not without a license waiver.

24.     Because Fusion-io deceived the standard setting organizations and the general

14

public with respect to these standards, Fusion-io and its successors-in-interest are estopped from, and/or have waived the right of, asserting that the patents cover the standardized UNMAP, TRIM, and DEALLOCATE commands and from asserting infringement against products that comply with the T10, T13, and NVM Express standards, including the SCSI, ATA, and NVMe standards.  By concealing its contention that it held patents and applications covering the TRIM or UNMAP command, Fusion-io and its assignees waived the right to assert that their patents and applications cover the UNMAP command and its equivalents TRIM and DEALLOCATE and waived the right to assert their patents against products that comply with the SCSI, ATA, and NVMe standards.

## <u>SIXTH AFFIRMATIVE DEFENSE – LICENSE AND COVENANT NOT TO SUE</u>

25.     UTL's claims for relief, in whole or in part, are precluded to the extent that any of the claims of the Patents-in-Suit are subject to a license and covenant not to sue, express and/or implied.

26.     Micron repeats and incorporates by reference paragraphs 5-24 of Micron's Affirmative Defenses as if fully set forth herein.

27.     Fusion-io's actions with respect to the T10 standard, combined with Fusion-io's promotion of the UNMAP command to T10, creates an implied license without compensation and a covenant not to sue for the Patents-in-Suit.

28.     Alternatively, Fusion-io's actions create an implied license on fair, reasonable, and nondiscriminatory terms in accordance with the T10 Patent Policy, and any damages are limited to these terms.

## <u>SEVENTH AFFIRMATIVE DEFENSE – STATUTE OF LIMITATIONS</u>

29.     UTL's recovery for any infringement of the Patents-in-Suit that it might establish is limited to any established infringement occurring no more than six years before the filing of this lawsuit, pursuant to 35 U.S.C. § 286.

## EIGHTH AFFIRMATIVE DEFENSE – LACK OF MARKING

30.     UTL's recovery for alleged infringement of the Patents-in-Suit, if any, is limited to alleged infringement committed after UTL provided actual or constructive notice of infringement under 35 U.S.C. § 287.

## NINTH AFFIRMATIVE DEFENSE – NO WILLFUL INFRINGEMENT

31.     UTL fails to state a claim for relief against Micron for enhanced or increased damages for willful infringement.

## TENTH AFFIRMATIVE DEFENSE – NO EXCEPTIONAL CASE

32.     UTL fails to state a claim for relief against Micron for an exceptional case under 35 U.S.C. § 285.

## ELEVENTH AFFIRMATIVE DEFENSE – NO COSTS

33.     UTL is barred by 35 U.S.C. § 288 from recovering any costs associated with this lawsuit.

## TWELFTH AFFIRMATIVE DEFENSE – LACK OF STANDING

34.     To the extent that UTL was not the sole and total owner of all substantial rights in any of the Patents-in-Suit as of the filing date of the Complaint, UTL lacks standing to bring one or more claims in this lawsuit.

35.     Micron repeats and incorporates by reference paragraphs 5-28 of Micron's Affirmative Defenses as if fully set forth herein.

36.     Fusion-io's actions do not give UTL all substantial rights in the Patents-in-Suit, so UTL lacks standing.

## THIRTEENTH AFFIRMATIVE DEFENSE – EXHAUSTION

37.     UTL's claims are barred, in whole or in part, by the doctrine of patent exhaustion.

**FOURTEENTH AFFIRMATIVE DEFENSE – ABSENCE OF DAMAGES**

38.     UTL has not suffered and will not suffer any injury or damages as a result of Micron's alleged conduct.

**FIFTEENTH AFFIRMATIVE DEFENSE – LACHES AND UNCLEAN HANDS,**

39.     UTL is barred, in whole or in part, under principles of equity, including laches, prosecution laches, and/or unclean hands.  UTL is also barred by issue preclusion from reasserting or altering its, or its predecessor-in-interest's, positions on factual and legal issues that were previously adjudicated.

40.     Micron repeats and incorporates by reference paragraphs 5-28 of Micron's Affirmative Defenses as if fully set forth herein.

41.     By failing to notify T10 about Fusion-io's patents and applications that Fusion-io believed to be related to TRIM, Fusion-io, combined with Fusion-io's promotion of the UNMAP command to T10, Fusion-io and its successors-in-interest lack the clean hands required for asserting that the patents cover the TRIM and UNMAP commands, as well as the equivalent DEALLOCATE command.

42.     Micron repeats and incorporates by reference paragraphs 44-84 of Micron's Affirmative Defenses below as if fully set forth herein.  UTL further lacks clean hands because of inequitable conduct in the procurement in of the Patents-in-Suit.

**SIXTEENTH AFFIRMATIVE DEFENSE – 28 U.S.C. § 1498**

43.     UTL's recovery for alleged infringement of the Patents-in-Suit, if any, is limited pursuant to 28 U.S.C. § 1498 to the extent that any alleged infringement, in whole or part, is attributable to the United States government.

**SEVENTEENTH AFFIRMATIVE DEFENSE – INEQUITABLE CONDUCT**

44.     Micron repeats and incorporates by reference paragraphs 5-28 of Micron's

Affirmative Defenses as if fully set forth herein.

45.    On information and belief, when Fusion-io filed the applications for the Patents-in-Suit, Fusion-io's business related to solid-state devices using flash memory.

46.    The cover pages of the Patents-in-Suit name David Flynn as an inventor.  David Flynn was a co-founder, chief technology officer,[2] CEO, and/or chairman of the board[3] of Fusion-io.

47.    The cover pages of the Patents-in-Suit name Michael Zappe as an inventor. Michael Zappe served as a chief software architect for Fusion-io.  Michael Zappe's LinkedIn profile[4] describes his role:



48.    On information and belief, David Flynn and Michael Zappe knew about the relevant standard-setting organizations T10 and T13 as a matter of regular business given their respective

---

[2] Fusion-io, *Fusion-io announces ioDrive, placing the power of a SAN in the palm of your hand* (Sept. 25, 2007), https://web.archive.org/web/20100509034736/http://www.fusionio.com/load/media-docsPress/fbdzz/Pressrelease_SANinhand.pdf.

[3] David Flynn, LinkedIn, https://www.linkedin.com/in/david-flynn-57736b1.

[4] Michael Zappe, LinkedIn, https://www.linkedin.com/in/zapman.

roles and given Fusion-io's general line of business.

49.     Microsoft employee Frank Shu submitted proposals to T13 for the adoption of the TRIM command as part of the ATA standard.

50.     Frank Shu's submission to T13 includes: document T13/e0715r0, titled "Notification of Deleted Data Proposal for ATA8-ACS2," revision 0, dated April 21, 2007; document T13/07154r1, titled "Data Set Management Commands Proposal for ATA8-ACS2," revision 1, dated July 26, 2007; document T13/07154r2, titled "Data Set Management Commands Proposal for ATA8-ACS2," revision 2, dated September 5, 2007; document T13/e07154r3, titled "Data Set Management Commands Proposal for ATA8-ACS2," revision 3, dated October 5, 2007; document T13/e07154r4, titled "Data Set Management Commands Proposal for ATA8-ACS2," revision 4, dated November 1, 2007; document T13/e071564r5, titled "Data Set Management Commands Proposal for ATA8-ACS2," revision 5, dated November 5, 2007; and document T13/e07154r6, titled "Data Set Management Commands Proposal for ATA8-ACS2," revision 6, dated December 12, 2007 (collectively, "Frank Shu's Trim Proposals").   Frank Shu's Trim Proposals are available on the T13 website, www.t13.org, under "Documents."

51.     Plaintiff's infringement contentions allege, in part, that Frank Shu's TRIM command infringes claims in each of the Patents-in-Suit.

52.     Fusion-io participated in T10.  *E.g.*, Ex. A (sending, by ABatwara at fusionio.com, an email to T10 members); Ex. B (submitting, by Fusion-io, a Patent Declaration).  Frank Shu's Trim Proposals were known to T10, and T10 considered the adoption of the UNMAP command as the equivalent of TRIM.  Ex. E.  On information and belief, Fusion-io representatives promoted the adoption of the UNMAP command by T10.  On information and belief, these Fusion-io activities in T10 occurred at the direction of and were known to David Flynn and/or Michael Zappe

in the ordinary course of Fusion-io's business, given David Flynn's and Michael Zappe's respective roles.

53.     On information and belief, David Flynn and/or Michael Zappe knew about Frank Shu's Trim Proposals during the pendency of each of the Patents-in-Suit.

54.     The covers of the Patents-in-Suit purport to claim priority back to U.S. provisional application 60/873,111, filed on December 6, 2006 ("December 6, 2006 Provisional"); U.S. provisional application 60/974,470, filed on September 22, 2007 ("September 22, 2007 Provisional"); and U.S. patent application 11/952,113, filed on December 6, 2007 ("December 6, 2007 Application"), which eventually issued as U.S. Patent No. 8,261,005.

55.     UTL contends that the TRIM command infringes claims of the Patents-in-Suit, but the claims of the Patents-in-Suit lack priority to at least the December 6, 2006 Provisional and the September 22, 2007 Provisional.  Thus, the TRIM command accused of infringement is instead invalidating prior art because Frank Shu publicly proposed the TRIM command not later than April 2007.

56.     During the prosecution of the December 6, 2007 Application, the applicant filed an Information Disclosure Statement on May 29, 2012, listing, as reference C48, revision 3 of Frank Shu's Trim Proposals, dated October 5, 2007:

| | C48 | MICROSOFT, "Data Set Management Commands Proposal for ATA8-ACS2, published October 5, 2007, Rev. 3 | |

Ex. C at 10.

57.     On information and belief, David Flynn and Michael Zappe cited this reference because they knew of TRIM's relevance to the pending applications.

58.     The listed October 5, 2007 date comes after the filing date of the September 22, 2007 Provisional.

59.     On information and belief, David Flynn and/or Michael Zappe also had possession of, but withheld, at least revision 2 of Frank Shu's Trim Proposals.  On information and belief, David Flynn and/or Michael Zappe printed at least revision 2 of Frank Shu's Trim Proposals on April 5, 2010.  On information and belief, David Flynn and/or Michael Zappe withheld revision 2 of Frank Shu's Trim Proposals because revision 2's date of September 5, 2007, precedes the filing date of the September 22, 2007 Provisional.

60.     On September 25, 2013, after the allowance of the '406 Patent, Fusion-io filed an information disclosure statement ("the '658 IDS") listing only one instance of Frank Shu's Trim Proposals, dated December 12, 2007.  Ex. F at 26.  This December 12, 2007 date matches the date of the sixth and last revision of Frank Shu's Trim Proposals.  The '658 IDS notes that the submitted reference was "printed April 5, 2010," well before the allowance of any Patent-in-Suit.

| | | Pgs. | |
|---|---|---|---|
| | D19 | SHU, "Data Set Management Commands Proposals for ATA8-ACS2," December 12, 2007, http://www.t13.org.Documents/UploadedDocuments/docs2008/e07154r6-Data_Set_Management_Proposal_for_ATA-ACS2.pdf, printed April 5, 2010 | |
| | | USPTO Office Action for U.S. Patent Application No. 12/711,113, mailed June 6, 2012 – P20090SUS1 | |

61.     But despite dating the reference as December 12, 2007, on the IDS, Fusion-io did not submit revision 6 of Frank Shu's Trim Proposals, dated December 12, 2007, to the Patent Office for consideration.  Fusion-io instead possessed and submitted revision 2 of Frank Shu's Trim Proposals, dated September 5, 2007, with the '658 IDS.

62.     Exhibit F at pages 28-35 is a true and correct copy of revision 2 of Frank Shu's Trim Proposals as retrieved from the USPTO file history of the '658 Patent.  This copy is dated September 5, 2007—not December 12, 2007, as listed in the IDS.  *Id.* at 28.

63.     David Flynn and/or Michael Zappe possessed one or more earlier revisions of Frank Shu's Trim Proposals, such as revision 2, but never correctly listed them in any IDS to the Patent Office.  On information and belief, David Flynn and/or Michael Zappe did so because revision 2 of Frank Shu's Trim Proposals has a date of September 5, 2007, which precedes the date of the

September 22, 2007 Provisional.

64.     Based on the citation to the T13 website in the '658 IDS, David Flynn and/or Michael Zappe is believed to have possessed and withheld the other revisions of Frank Shu's Trim Proposals which are accessible on the T13 website.  On information and belief, David Flynn and/or Michael Zappe withheld revisions 0 and 1 of Frank Shu's Trim Proposals because these also had priority dates that also precede the filing date of the September 22, 2007 Provisional.

65.     On information and belief, David Flynn and/or Michael Zappe intentionally mis-dated the D19 entry in the '658 IDS as "December 12, 2007," rather than "September 5, 2007," in order to prevent the Patent Examiner from using Frank Shu's Trim Proposals to reject the pending claims, which the Examiner believed to have priority to the September 22, 2007 Provisional or to the December 6, 2007 Application.  The incorrect date cannot be explained by mistake, such as the accidental strike of an adjacent number on a keyboard; it must have been intentional.  From this intentionally incorrect date, combined with the selective disclosure of only revision 3 of Frank Shu's Trim Proposals, dated October 5, 2007, during the prosecution of the December 6, 2007 Application, the only possible inference is an intent to deceive the Patent Examiner to avoid examining the Patents-in-Suit against earlier revisions of Frank Shu's Trim Proposals that predate the September 22, 2007 Provisional.

66.     The incorrect December 12, 2007 date led the Examiner to believe that the submitted reference published after each of the December 6, 2006 Provisional, September 22, 2007 Provisional, and December 6, 2007 Application to which the '658 and '727 Patents claim priority, and thus led the Examiner to believe there was no need to look at the later-dated reference that would not qualify as prior art.  The incorrect date successfully deceived the Examiner.

67.     On or about July 22, 2014, Fusion-io executed an assignment to Intellectual

22

Property Holdings 2 LLC, a Delaware limited liability company, as recorded in the USPTO Assignment Database, reel 033389, frame 0511-0538.  Ex. D at 1, 5.

68.     In the assignment, Fusion-io assigned the '658 Patent, the '406 Patent, application 14/309,751 (which would later issue as the '727 Patent), and other patents and applications to Intellectual Property Holdings 2 LLC.  Ex. D.

69.     On frame 0524, Fusion-io noted its belief that the '658 Patent related to "PTRIM," believed to refer to "Persistent TRIM," and that the '406 Patent related to "TRIM."  *Id.* at 14.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| US | PTRIM, APPARATUS, SYSTEM, AND METHOD FOR MANAGING DATA IN A STORAGE DEVICE WITH AN EMPTY DATA TOKEN DIRECTIVE | Issued | 13566471 | 8/3/2012 | 2.01E+10 | 12/27/2012 | 8762658 | 6/24/2014 |
| US | ASMF MANAGING DATA USING A DATA PIPELINE | Issued | 13600077 | 8/30/2012 | US 2012-0324311 | 12/20/2012 | 8533569 | 9/10/2013 |
| US | TRIM ASMF Identifying Data that is No Longer in Use | Issued | 13607486 | 9/7/2012 | 2.01E+10 | 1/24/2013 | 8533406 | 9/10/2013 |

70.     On frame 0524, Fusion-io also noted its belief that application 14/309,751, which ultimately issued as the '727 Patent, related to "TRIM."  *Id.* at 14.

| | | | | |
|---|---|---|---|---|
| US | TRIM ASMF MANAGING DATA IN A STORAGE DEVICE WITH AN EMPTY DATA TOKEN DIRECTIVE | Pending | 14309751 | 6/19/2014 |

71.     On information and belief, David Flynn and Michael Zappe knew of the relevance of Frank Shu's Trim Proposals to the Patents-in-Suit through at least July 22, 2014, as evidenced by the recorded assignment.

72.     On information and belief, David Flynn and/or Michael Zappe possessed and intentionally withheld the early revisions 0 and 1 of Frank Shu's Trim Proposals to the U.S. Patent Office during the prosecution of each of the Patents-in-Suit.  But for the withholding of the early

revisions 0 and 1 of Frank Shu's Trim Proposals, which predate the September 22, 2007 Provisional and December 6, 2007 Application, none of the claims of the Patents-in-Suit would have issued.

73.     On information and belief, David Flynn and/or Michael Zappe possessed and withheld revisions 0, 1, 2, 4, 5, and 6 of Frank Shu's Trim Proposals from the U.S. Patent Office before the notice of allowance issued for the '406 Patent.  On information and belief, David Flynn and/or Michael Zappe possessed at least revisions 2 and 6 of Frank Shu's Trim Proposals as "printed on April 5, 2010," and likely possessed and withheld all other versions.  David Flynn and/or Michael Zappe did not disclose revisions 0, 1, 2, 4, 5, and 6 of Frank Shu's Trim Proposals to the Patent Office before allowance of the '406 Patent.  But-for the withholding of Frank Shu's Trim Proposals, the Examiner would not have allowed the '406 Patent.

74.     On information and belief, David Flynn and/or Michael Zappe intentionally mis-dated revision 2 of Frank Shu's Trim Proposals in the IDS to have the later December 12, 2007 date of revision 6 of Frank Shu's Trim Proposals.  But-for their deceiving the Examiner with the incorrect date, the Examiner would not have allowed the '658 Patent or the '727 Patent.

75.     On information and belief, David Flynn and/or Michael Zappe possessed and withheld other revisions of Frank Shu's Trim Proposals during the pendency of the '658 Patent and '727 Patent.  But-for the withholding of these other revisions, the Examiner would not have allowed the '658 Patent and '727 Patent.

76.     On information and belief, David Flynn and/or Michael Zappe acted with the specific intent to deceive the Patent Office.  On information and belief, David Flynn and Michael Zappe knew that "TRIM" related to the Patents-in-Suit at least from May 29, 2012, through July 22, 2014, evidenced by their citation of revision 2 of Frank Shu's Trim Proposals during the

prosecution of the December 6, 2007 Application and evidenced by the notes "TRIM" or "PTRIM" in the assignment records.  Ex. C at 10; Ex. D at 14.  On information and belief, Fusion-io's participation in T10 occurred at the direction or knowledge of David Flynn and/or Michael Zappe as a matter of regular business in the solid-state device industry.  On information and belief, Fusion-io encouraged T10 to adopt the UNMAP command at the knowledge or direction of David Flynn and/or Michael Zappe.

77.     On information and belief, David Flynn held equity in Fusion-io, as is customary for co-founders of companies.

78.     On information and belief, Michael Zappe also held equity in Fusion-io, a common form of compensation for employees of tech startups like Fusion-io.

79.     On or about July 22, 2014, Fusion-io executed an assignment to Intellectual Property Holdings 2 LLC, a Delaware limited liability company, as recorded in the USPTO Assignment Database at reel 033389, frames 0511-0538 for valuable consideration.  Ex. D at 1, 5.

80.     Because of their equity, David Flynn and Michael Zappe stood to benefit directly from the value and assignment of Fusion-io's intellectual property.

81.     On information and belief, David Flynn and/or Michael Zappe intended to deceive the Patent Office in order to obtain patents that they believed covered the TRIM and the equivalent UNMAP commands.  At the same time, David Flynn and/or Michael Zappe failed to inform T10 about their beliefs that their patent applications covered the TRIM or UNMAP commands, despite the T10 Patent Policy, available at https://www.t10.org/patpol.htm, requiring disclosure.  Thus, by promoting standard adoption, David Flynn and/or Michael Zappe schemed to create a large base of users for the purpose of extorting patent license fees using inequitably and fraudulently procured patents and/or to inflate the value of their patents for doing so when assigning the patents to

Intellectual Property Holdings 2 LLC.

82.     Each of the Patents-in-Suit is unenforceable because of inequitable conduct.

### RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES

Micron reserves all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses at law or in equity that may exist now or that may be available in the future based on discovery and further factual investigation in this action.

### COUNTERCLAIMS

Micron, by and through its undersigned counsel, incorporates its answers and affirmative defenses as set forth above, and alleges counterclaims against Plaintiff/Counter-Defendant UTL for invalidity, non-infringement, unenforceability, and Walker Process fraud of the Patents-in-Suit as follows:

### BACKGROUND

1.     According to the allegations set forth in its Complaint, UTL claims to be the assignee and owner of the Patents-in-Suit.  Dkt. 1 ¶¶ 28, 34, 40.

2.     UTL has accused Micron of infringing the Patents-in-Suit.  Micron denies that any of its products infringe any valid and enforceable claim in the Patents-in-Suit.

3.     An actual case and controversy exists between Micron and UTL concerning the alleged infringement of one or more claims of the Patents-in-Suit, and that controversy is ripe for adjudication.

### PARTIES

4.     Counterclaimant-Plaintiff MTI is a Delaware corporation with its principal place of business at 8000 S. Federal Way, Boise, Idaho 83716.

5.     Counterclaimant-Plaintiff Micron Texas is an Idaho limited liability company with

its principal office at 8000 S. Federal Way, Boise, Idaho 83716.

6.     Counterclaimant-Plaintiff MSP is an Idaho corporation with its principal office at 8000 S. Federal Way, Boise, Idaho 83716.

7.     Counterclaimant-Defendant UTL alleges it is a Texas limited liability company with its principal place of business at 6136 Frisco Square Boulevard, Suite 400, Frisco, Texas 75034.  *See* Dkt. 1 ¶ 2.

## JURISDICTION AND VENUE

8.     This is an action for declaratory judgment under 28 U.S.C. §§ 2201 and 2202.  This Court has subject matter jurisdiction over these Counterclaims under §§ 1331 and 1338(a).  These Counterclaims arise under the patent laws of the United States.

9.     This Court has personal jurisdiction over UTL, at least because by initiating this lawsuit, UTL has submitted to this District's jurisdiction.

10.    Venue for these Counterclaims is proper under this District under 28 U.S.C. §§ 1391 and 1400.

## COUNTERCLAIM 1

## (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '658 PATENT)

11.    Micron incorporates by reference the admissions, denials, and allegations set forth in the preceding paragraphs of this First Amended Answer as if fully set forth herein.

12.    An actual controversy exists between Micron and UTL as to whether Micron infringes the '658 Patent, as UTL contends, or does not do so, as Micron contends.

13.    Micron has been damaged by UTL's filing of a lawsuit against Micron based on a patent that Micron does not infringe.

14.    By this Counterclaim, Micron seeks a declaration that it has not infringed and does not infringe any valid and enforceable claim of the '658 Patent either directly or indirectly, literally

or under the doctrine of equivalents, or willfully, and is entitled to a declaration.

15.     A judicial declaration is necessary and appropriate at this time such that Micron may ascertain its rights and duties with respect to the '658 Patent and with respect to any past, present, or future manufacture, use, importation, distribution, sale, or offer for sale of its products.

16.     This is an exceptional case entitling Micron to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM 2

## (DECLARATORY JUDGMENT OF INVALIDITY OF THE '658 PATENT)

17.     Micron incorporates by reference the admissions, denials, and allegations set forth in the preceding paragraphs of this First Amended Answer as if fully set forth herein.

18.     An actual controversy exists between Micron and UTL as to whether the '658 Patent is valid, as UTL contends, or is invalid for failure to comply with the requirements of patentability of the Patent Laws of the United States, Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, 111, 112, 115, 116, 119, 132, 251, 256, and/or 282, as Micron contends.

19.     For example, U.S. Patent No. 7,409,489 ("Sinclair"), attached hereto as Exhibit A, was filed on October 25, 2005, and issued on August 5, 2008, and is therefore prior art under at least § 102(e).

20.     Sinclair anticipates and/or renders obvious one or more claims of the '658 Patent.

21.     By this Counterclaim, Micron seeks a declaration that the claims of the '658 Patent are invalid.  A judicial declaration is necessary and appropriate at this time such that Micron may ascertain its rights and duties with respect to the '658 Patent and with respect to any past, present, or future manufacture, use, importation, distribution, sale, or offer for sale of its products.

22.     This is an exceptional case entitling Micron to an award of its attorneys' fees

incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM 3

### (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '406 PATENT)

23.    Micron incorporates by reference the admissions, denials, and allegations set forth in the preceding paragraphs of this First Amended Answer as if fully set forth herein.

24.    An actual controversy exists between Micron and UTL as to whether Micron infringes the '406 Patent, as UTL contends, or does not do so, as Micron contends.

25.    Micron has been damaged by UTL's filing of a lawsuit against Micron based on a patent that Micron does not infringe.

26.    By this Counterclaim, Micron seeks a declaration that it has not infringed and does not infringe any valid and enforceable claim of the '406 Patent either directly or indirectly, literally or under the doctrine of equivalents, or willfully, and is entitled to a declaration.

27.    A judicial declaration is necessary and appropriate at this time such that Micron may ascertain its rights and duties with respect to the '406 Patent and with respect to any past, present, or future manufacture, use, importation, distribution, sale, or offer for sale of its products.

28.    This is an exceptional case entitling Micron to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM 4

### (DECLARATORY JUDGMENT OF INVALIDITY OF THE '406 PATENT)

29.    Micron incorporates by reference the admissions, denials, and allegations set forth in the preceding paragraphs of this First Amended Answer as if fully set forth herein.

30.    An actual controversy exists between Micron and UTL as to whether the '406 Patent is valid, as UTL contends, or is invalid for failure to comply with the requirements of patentability of the Patent Laws of the United States, Title 35 of the United States Code, including,

but not limited to, 35 U.S.C. §§ 101, 102, 103, 111, 112, 115, 116, 119, 132, 251, 256, and/or 282, as Micron contends.

31.     For example, Sinclair, attached hereto as Exhibit A, was filed on October 25, 2005, and issued on August 5, 2008, and is therefore prior art under at least § 102(e).

32.     Sinclair anticipates and/or renders obvious one or more claims of the '406 Patent.

33.     By this Counterclaim, Micron seeks a declaration that the claims of the '406 Patent are invalid.  A judicial declaration is necessary and appropriate at this time such that Micron may ascertain its rights and duties with respect to the '406 Patent and with respect to any past, present, or future manufacture, use, importation, distribution, sale, or offer for sale of its products.

34.     This is an exceptional case entitling Micron to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM 5

## (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '727 PATENT)

35.     Micron incorporates by reference the admissions, denials, and allegations set forth in the preceding paragraphs of this First Amended Answer as if fully set forth herein.

36.     An actual controversy exists between Micron and UTL as to whether Micron infringes the '727 Patent, as UTL contends, or does not do so, as Micron contends.

37.     Micron has been damaged by UTL's filing of a lawsuit against Micron based on a patent that Micron does not infringe.

38.     By this Counterclaim, Micron seeks a declaration that it has not infringed and does not infringe any valid and enforceable claim of the '727 Patent either directly or indirectly, literally or under the doctrine of equivalents, or willfully, and is entitled to a declaration.

39.     A judicial declaration is necessary and appropriate at this time such that Micron may ascertain its rights and duties with respect to the '727 Patent and with respect to any past,

present, or future manufacture, use, importation, distribution, sale, or offer for sale of its products.

40.     This is an exceptional case entitling Micron to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM 6

## (DECLARATORY JUDGMENT OF INVALIDITY OF THE '727 PATENT)

41.     Micron incorporates by reference the admissions, denials, and allegations set forth in the preceding paragraphs of this First Amended Answer as if fully set forth herein.

42.     An actual controversy exists between Micron and UTL as to whether the '727 Patent is valid, as UTL contends, or is invalid for failure to comply with the requirements of patentability of the Patent Laws of the United States, Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, 111, 112, 115, 116, 119, 132, 251, 256, and/or 282, as Micron contends.

43.     For example, Sinclair, attached hereto as Exhibit A, was filed on October 25, 2005, and issued on August 5, 2008, and is therefore prior art under at least § 102(e).

44.     Sinclair anticipates and/or renders obvious one or more claims of the '727 Patent.

45.     By this Counterclaim, Micron seeks a declaration that the claims of the '727 Patent are invalid.  A judicial declaration is necessary and appropriate at this time such that Micron may ascertain its rights and duties with respect to the '727 Patent and with respect to any past, present, or future manufacture, use, importation, distribution, sale, or offer for sale of its products.

46.     This is an exceptional case entitling Micron to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM 7

## (DECLARATORY JUDGMENT OF UNENFORCEABILITY)

47.     Micron incorporates by reference the admissions, denials, and allegations set forth

in the preceding paragraphs of this First Amended Answer as if fully set forth herein.

48.     An actual controversy exists between Micron and UTL as to whether the Patents-in-Suit are enforceable.

49.     By this Counterclaim, Micron seeks a declaration that the Patents-in-Suit are unenforceable for inequitable conduct, unclean hands, and/or estoppel.  A judicial declaration is necessary and appropriate at this time such that Micron may ascertain its rights and duties with respect to the Patents-in-Suit and with respect to any past, present, or future manufacture, use, importation, distribution, sale, or offer for sale of its products.

50.     This is an exceptional case entitling Micron to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM 8

## (DECLARATORY JUDGMENT OF LICENSED USE OR WAIVER)

51.     Micron incorporates by reference the admissions, denials, and allegations set forth in the preceding paragraphs of this First Amended Answer as if fully set forth herein.

52.     By this Counterclaim, Micron seeks a declaration that Fusion-io's actions gave rise to a license to use the Patents-in-Suit and/or waived infringement claims against ANSI, ANSI members, and users of ANSI standards. A judicial declaration is necessary and appropriate at this time such that Micron may ascertain its rights and duties with respect to the Patents-in-Suit and with respect to any past, present, or future manufacture, use, importation, distribution, sale, or offer for sale of its products.

53.     This is an exceptional case entitling Micron to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

**COUNTERCLAIM 9**

**(*WALKER PROCESS* FRAUD IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2)**

54.     Micron incorporates by reference the admissions, denials, and allegations set forth in the preceding paragraphs of this First Amended Answer as if fully set forth herein.

55.     The Patents-in-Suit were fraudulently procured by the inequitable conduct and unclean hands of David Flynn and/or Michael Zappe based on the facts stated in affirmative defenses above.

56.     UTL knows that the Patents-in-Suit were fraudulently procured by the inequitable conduct and unclean hands of David Flynn and/or Michael Zappe at least of the filing date of this First Amended Answer.

57.     UTL would likely have known that the Patents-in-Suit were fraudulently procured by the inequitable conduct and unclean hands of David Flynn and/or Michael Zappe when UTL conducted customary due diligence before acquiring the Patents-in-Suit.

58.     UTL knows that the Patents-in-Suit are invalid for the reasons identified in Micron's invalidity contentions.  UTL knows that the PTAB has instituted IPR against each of the Patents-in-Suit and that the PTAB held that Micron has a "reasonable likelihood of success" in prevailing against at least one claim of each challenged Patent-in-Suit.  UTL knows that Micron's products cannot infringe the asserted claims of the Patents-in-Suit because UTL's infringement allegations are conflicting and contradictory, and Micron has informed UTL of this several times. UTL knows that Micron's products cannot infringe the asserted claims of the Patents-in-Suit because UTL lost on constructions of multiple claim terms that UTL relies on for its infringement theories.  UTL knows that the accused TRIM command predates the priority of the asserted patents, so the accused command is instead invalidating prior art under UTL's own theories, as explained

in Micron's IPR petitions.

59.    UTL continues to assert the Patents-in-Suit in bad faith.

60.    If any of the Patents-in-Suit do cover (not conceded) the TRIM, DEALLOCATE, or UNMAP commands, then the relevant antitrust market consists of a technology market for intellectual property that is licensed to allow standards-compliant (SATA, SCSI, or NVMe) flash memory storage devices to use a delete-type command in the United States ("the Technology Market").  Flash memory storage devices are often referred to as "SSD's," short for "solid-state storage devices."  Fusion-io's unclean hands in breaching the T10 Patent Policy prevented the standards setting organizations from considering alternative technologies during the standard-setting time period and made alternative technology licenses to unsuitable as alternatives after the standards finalized.

61.    UTL has willfully and intentionally monopolized and/or attempted to monopolize the Technology Market.

62.    According to UTL, "several major SSD market competitors have already taken licenses to the Patents-in-Suit, including Intel Corp., Google, LLC, Samsung Electronics America, Inc., SK Hynix, Inc., Western Digital, Inc., Toshiba America, Inc. and e.Digital Corp."  Dkt. No. 1 ¶ 24.

63.    UTL accused the SSDs of Dell, Inc.; Dell Technologies Inc.; and HP Inc. of infringing the Patents-in-Suit.  UTL has also made Dell, Inc.; Dell Technologies Inc.; and HP Inc. settle infringement claims based on the Patents-in-Suit.

64.    UTL has confidential license agreements for the Patents-in-Suit affecting other entities.  Intel Corp.; Google, LLC; Samsung Electronics America, Inc.; SK Hynix, Inc.; Western Digital, Inc.; Toshiba America, Inc.; e.Digital Corp.; Dell, Inc.; Dell Technologies Inc.; HP Inc.,

and the unnamed entities will be referred to as the "Market Licensees."

65.     UTL's history of making the Market Licensees license the Patents-in-Suit shows that UTL has monopoly power in the Technology Market or is attempting to monopolize the Technology Market.

66.     UTL has caused anticompetitive harm to Micron and other Market Licensees.

67.     UTL has caused the other Market Licensees, and is attempting to cause Micron, to license the Patents-in-Suit at anticompetitive rates well above rates that would have been set in the presence of fair competition.  UTL has caused the other Market Licensees, and is attempting to cause Micron, to license the Patents-in-Suit at anticompetitive rates exceeding the free or reasonable royalty that would have been set had the Patents-in-Suit been timely disclosed in compliance with the T10 Patent Policy.

68.     Had the Patents-in-Suit been timely disclosed in accordance with the T10 Patent Policy, then the SATA, SCSI, and NVMe standards would not have adopted the standards in their current form, at least not without a free license and/or reasonable and nondiscriminatory license to the Patents-in-Suit.  At best, the standards would have obtained a free license or would have adopted a competing, noninfringing technology during the standard setting process.  If any technology in Micron's invalidity contentions if found not to anticipate the claims, such technology would be a competing, noninfringing alternative.  At worst, the license value for the Patents-in-Suit would have been set based on the reasonable and non-discriminatory rate reflective of value of the technology, if any.  But due to Fusion-io's breach of the T10 Patent Policy, UTL has forced the Market Licensees to license the Patents-in-Suit at anticompetitive royalty rates reflective of potential lawsuit damages attributable to widespread adoption of standardized products rather than reflecting the competitive value of the technology.  Fusion-io and its successors-in-interest waited

for a standard to adopt technology and waited for standardized products to become widespread before revealing the Patents-in-Suit, in violation of the T10 Patent Policy, in order to seek royalty rates at anticompetitive values.

69.     Fusion.io's fraudulent procurement of the Patents-in-Suit, its breach of the T10 Patent Policy, and UTL's perpetuation of that fraud and bad faith assertions of the Patents-in-Suit have eliminated free and fair competition for licenses to competitive technology that would otherwise be standardized.

70.     UTL also forced the Market Licensees and is now attempting to force Micron to license the Patents-in-Suit at anticompetitive royalty rates due to the difficulty of changing a standard after widespread adoption of the standard.  So again, UTL has forced the Market Licensees to license the Patents-in-Suit at anticompetitive royalty rates reflective of potential lawsuit damages attributable to widespread adoption of standardized products rather than a fair, discounted rate that accounts for the possibility of switching to a competing technology in a pre-standardized setting.

71.     The anticompetitive royalty rate caused or will cause Micron and the Market Licensees to be injured by paying supracompetitive royalties and raising their product prices.  Had the violation of the T10 Patent Policy never occurred, then the SATA, SCSI, and NVMe standards would have adopted a different technology, obtained a free license to the technology, or at least obtained a reasonable and non-discriminatory license to the patented technology.  Any royalty or damages beyond these alternatives are anticompetitive.  The violation of the T10 Patent Policy prevented the standard-setting organizations from considering and/or using different, competing technologies.

72.     As another direct result of UTL's anticompetitive conduct, Micron will incur

substantial legal fees in defending UTL's bad faith assertion of IP rights.  Downstream purchasers of Micron's SSDs will be injured by paying monopolistic prices that include monopolistic royalties to UTL.

73.     As a result of having to pay attorneys' fees and unnecessary costs that would have been avoided absent UTL's objectively and subjectively bad faith assertions of IP rights, competition among Micron and other competitors in the Technology Market is restrained.   Absent UTL's bad faith assertions of IP rights, Micron and other competitors could instead invest the fees and costs in the improvement of their products and services in competition with one another.

74.     Micron sells its SATA and NVMe SSDs in interstate commerce.  The SATA, SCSI, and NVMe standards are used across interstate commerce.  UTL is seeking to license its Patents-in-Suit across interstate commerce.

75.     As a direct and proximate result of UTL's anticompetitive conduct as alleged herein, Micron has been damaged in an amount to be proven at trial, trebled pursuant to 15 U.S.C. § 15(a).

76.     As further direct and proximate result of UTL's anticompetitive conduct, Micron is entitled to recover its attorneys' fees and costs herein, pursuant to 15 U.S.C. § 15(a).

## **JURY DEMAND**

77.     Pursuant to Federal Rule of Civil Procedure 38(b), Micron demands a trial by jury on all issues so triable.

## <u>MICRON'S PRAYER FOR RELIEF</u>

WHEREFORE, Micron prays for judgment as follows:

A.    For dismissal of UTL's Complaint with prejudice, and that UTL shall take nothing against Micron;

B.    For a judgment and declaration that Micron does not infringe each and every claim in the Patents-in-Suit;

C.    For a judgment and declaration that the Patents-in-Suit, and each and every claim thereof, are invalid, unenforceable, waived, or licensed, or in the alternative, limited to a reasonable and nondiscriminatory rate;

D.    For a judgment, pursuant to 35 U.S.C. § 285, that UTL's conduct renders this case exceptional and that the Court award Micron its attorneys' fees and costs;

E.    For a judgment that UTL violated Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and for an order awarding to Micron all damages resulting from UTL's antitrust violation, including Micron's attorneys' fees, expert fees, and costs;

F.    For an award to Micron of trebled damages and attorneys' fees under 15 U.S.C. § 15(a) for UTL's antitrust violation;

G.    The Court award Micron's costs of suit; and

H.    For such other and further relief as the Court deems just and proper.

Dated: August 13, 2021                    Respectfully submitted,


                                          By:   /s/ Michael R. Rueckheim
                                                Thomas M. Melsheimer
                                                State Bar No. 13922550
                                                TMelsheimer@winston.com

Natalie Arbaugh
State Bar No. 24033378
NArbaugh@winston.com
Qi (Peter) Tong
State Bar No. 24119042
PTong@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Telephone: (214) 453-6500
Facsimile: (214) 453-6400

Katherine Vidal
*Pro Hac Vice*
State Bar No. 194971
KVidal@winston.com
Michael R. Rueckheim
State Bar No. 24081129
MRueckheim@winston.com
WINSTON & STRAWN LLP
275 Middlefield Road, Suite 205
Menlo Park, CA 94025
Telephone: (650) 858-6500
Facsimile: (650) 858-6559

Vivek V. Krishnan
*Pro Hac Vice*
VKrishnan@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

**ATTORNEYS FOR DEFENDANTS
MICRON TECHNOLOGY, INC.;
MICRON SEMICONDUCTOR
PRODUCTS, INC.; MICRON
TECHNOLOGY TEXAS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 13, 2021, the foregoing document was electronically filed with the Clerk of Court using the Court's CM/ECF system which will send notification of such filing to all counsel of record, including counsel of record for Plaintiff Unification Technologies LLC.

*/s/ Michael R. Rueckheim*
Michael R. Rueckheim

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **UNIFICATION TECHNOLOGIES LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| **MICRON TECHNOLOGY, INC.,** | ) | **Case No. 6:20-CV-500-ADA** |
| **MICRON SEMICONDUCTOR** | ) | |
| **PRODUCTS, INC.,** | ) | |
| **MICRON TECHNOLOGY TEXAS, LLC,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### [PROPOSED] AGREED PROTECTIVE ORDER

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, Unification Technologies LLC ("Plaintiff" or "UTL"), and Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC ("Defendants" or "Micron") (collectively, "the Parties") have stipulated and agreed to the terms and entry of, and the Court hereby orders the Parties to abide by, this Protective Order.

This Protective Order is issued to facilitate document disclosure and production under the Local Rules of this Court and the Federal Rules of Civil Procedure. Information subject to this Protective Order may be used only for the purposes of a lawsuit governed by this Protective Order. Unless modified pursuant to the terms contained in this Protective Order, this Protective Order shall remain in effect through the conclusion of each lawsuit governed by this Protective Order.

In support of this order, the Court finds that:

1) Documents and information containing confidential, proprietary business information, and/or trade secrets ("Confidential Information") that bear significantly on the Parties' claims or defenses are likely to be disclosed or produced during the course of discovery in each lawsuit governed by this Protective Order;

2)      Counsel for the Party receiving Confidential Information may presently be without sufficient information to accept the representation(s) made by the Party or Non-Party producing Confidential Information as to the confidential, proprietary, and/or trade secret nature of such Confidential Information; and

3)      To protect the respective interests of the Parties and Non-Parties and to facilitate the progress of disclosure and discovery in each lawsuit governed by this Protective Order, the Court will issue this Protective Order.

IT IS, THEREFORE, ORDERED THAT:

### Definitions

A.      "Party": any party to the above-captioned action ("Action"), including all of its officers, directors, employees, and outside counsel (and their support staffs).

B.      "Plaintiff": Unification Technologies LLC, including all of its officers, directors, employees, and outside counsel (and their support staffs).

C.      "Defendants": Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC, including all of their officers, directors, employees, and outside counsel (and their support staffs).

D.      "Material": all information, documents, items and things produced, served, made available, or otherwise provided in this Action (whether paper, electronic, tangible or otherwise) by the Parties or by Non-Parties.

E.      "Producing Party": a Party or Non-Party that produces Material in this Action.

F.      "Receiving Party": a Party that receives Material from a Producing Party in this Action.

G.      "Designating Party": a Party or Non-Party that designates Material as "CONFIDENTIAL," "CONFIDENTIAL OUTSIDE COUNSEL'S EYES ONLY" or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" in this Action.

H.      "Non-Party": any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

I.      "Data Breach" means any accidental, unlawful, or unauthorized destruction, alteration, disclosure, loss, theft, copying, use, modification, disposal, compromise, or access to Protected Material or any act or omission that compromises or undermines the physical, technical, or organizational safeguards put in place by Receiving Party in processing or possessing a Producing Party's Protected Material.

J.      "Circuit Schematic Files": a computer file or document containing a graphical representation of an integrated circuit that shows the connections between the various components of the circuit. Circuit Schematic Files include complete hierarchical printouts (*e.g.*, in PDF format) of schematic and logical netlist views that are used for abstract level simulation, but not for device fabrication. Circuit Schematic Files do not include Physical Design Files.

K.      "Physical Design Files": a computer file or document that shows the physical arrangement of the components of the integrated circuit, also called the circuit layout. Physical Design Files are typically the final output product of integrated circuit design that is used by a foundry to fabricate an integrated circuit. Physical Design Files may include, for example, GDS (Graphic Database System), GDSII stream format, DEF (Design Exchange Format), and LEF (Library Exchange Format) files, but do not include Circuit Schematic Files.

L.      "HDL Source Code": a computer file or files that contain electronic hardware descriptions in a hardware description language, such as Verilog or VHDL. HDL Source Code refers only to native electronic files that are in a human readable format suitable for input to an assembler, compiler, interpreter, synthesis tool, or other translator.

M.      "Source Code": a compilation of computer instructions and data definitions expressed in a human-readable form suitable for input to an assembler, compiler, interpreter, or other translator, including HDL Source Code.

N.      "Source Code Material": all software, firmware, Source Code, HDL Source Code, Circuit Schematic Files, or Physical Design Files.

O.      "CONFIDENTIAL" Material: Material the Designating Party believes in good faith is not generally known to others, and that the Designating Party (i) would not normally reveal to third parties except in confidence or has undertaken with others to maintain in confidence, (ii) believes in good faith is protected by a right to privacy under federal or state law or any other applicable privilege or right related to confidentiality or privacy, or (iii) believes in good faith to constitute or to contain confidential and/or proprietary information not otherwise known or available to the public. CONFIDENTIAL Material shall include all Material referring or relating to the foregoing, including but not limited to copies, summaries, and abstracts of the foregoing. Any Party may use the "CONFIDENTIAL" designation only if, in the good faith belief of such Party and its counsel, the unrestricted disclosure of such information and/or Materials could be potentially harmful to the business or operations of the party.

P.      "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material: Material the Designating Party believes in good faith is not generally known to others and has significant competitive value such that unrestricted disclosure to others would create a substantial risk of serious injury, and which the Designating Party (i) would not normally reveal to third parties except in confidence or has undertaken with others to maintain in confidence, (ii) believes in good faith is protected by a right to privacy under federal or state law or any other applicable privilege or right related to confidentiality or privacy, or (iii) believes in good faith constitutes proprietary financial, research, development, technical, or commercially sensitive competitive information that the  Producing Party maintains as highly confidential in its business or the disclosure of which is likely to cause harm to the competitive position of the Producing Party. CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material shall include all Material referring or relating to the foregoing, including but not limited to copies, summaries, and abstracts of the foregoing.

Q.     "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material: Material constituting Source Code Material as produced pursuant to Paragraph 13 below or as incorporated into, for example, documents, answers to interrogatories, technical expert reports, or deposition testimony. RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material shall include all Material referring or relating to the foregoing, including but not limited to copies, summaries, and abstracts of the foregoing. References to the Bates number of a previously printed page of RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material are not RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material.

R.     "Involved In The Prosecution Of Patents Or Patent Applications": participation in any way on behalf of a patent owner/patent applicant or other person or entity having ownership, license, or other financial interest in the patent or in the patent or reissue application, in (i) reexamination proceedings before the United States Patent and Trademark Office or any foreign agency responsible for examining or issuing patents (which, for clarity, does not include review proceedings before the Patent Trial and Appeal Board), or (ii) drafting, reviewing, approving, or prosecuting any portion (*e.g.*, any claim, any figure, or any specification language) of a patent application (including, but not limited to, provisional, non-provisional, original, continuation, continuation-in-part, divisional, reissue, and/or continued prosecution applications) or any portion of any amendment, response, reply, or other paper submitted to the United States Patent and Trademark Office or any foreign agency responsible for examining or issuing patents (which, for clarity, does not include review proceedings before the Patent Trial and Appeal Board).

S.     "Protected Matters": Confidential Information, including but not limited to documents, deposition testimony, discovery responses, summaries of Confidential Information or briefs discussing or containing Confidential Information, as well as copies thereof, disclosed or produced by any Producing Party in a lawsuit governed by this Protective Order. No Material shall be deemed Protected Matters if:

(1)     it is in the public domain at the time of disclosure;

(2)     it becomes part of the public domain;

(3)     the Receiving Party can show it was in the Receiving Party's rightful and lawful possession at the time of disclosure;

(4)     the Receiving Party lawfully received it from a Non-Party without restriction as to disclosure, provided such Non-Party has the right to make the disclosure to the Receiving Party; or

(5)     the Receiving Party can show it was independently developed by the Receiving Party after the time of disclosure by personnel who did not have access to the Producing Party's Protected Matters.

### Confidential Information

1.      Except as otherwise indicated below, Protected Matters may be designated by a Producing Party or Designating Party as "CONFIDENTIAL," "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY," or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" as described below.

2.      Protected Matters and any information contained therein shall not be used or shown, disseminated, copied, or in any way communicated to anyone for any purpose whatsoever, except as provided in this Protective Order.

3.      Protected Matters designated as "CONFIDENTIAL" and any information contained therein may be disclosed (and copies may be made to facilitate this disclosure) only to the following persons ("Qualified Persons"):

(a)     Outside counsel of record in a lawsuit governed by this Protective Order for the Party receiving Protected Matters;

(b)     Any four (4) in-house counsel of a Receiving Party who have responsibility for maintaining, defending, or evaluating this litigation. No CONFIDENTIAL Material shall be

disclosed to such in-house counsel until the individual has signed the Confidentiality Undertaking attached hereto as Exhibit A, thereby declaring that he or she has read and understands this Protective Order and agrees to be bound by its provisions. Such written agreement shall be retained by counsel for the Receiving Party;

(c)     Administrative staff, *e.g.*, paralegals and secretaries, working for counsel defined in Paragraphs 3(a) and 3(b) (excluding experts and investigators) assigned to and necessary to assist counsel in the preparation and trial of this action;

(d)     The Court and Court personnel;

(e)     The Mediator;

(f)     Actual or potential independent experts or consultants (including translators) who have been approved in accordance with Paragraph 14, including signing a document agreeing to be bound by the terms of this protective order (at Exhibit A hereto) and whose identity, as well as all present and prior relationships or affiliations, is provided to the Producing Party whose Protected Matters are to be disclosed for purposes in accordance with Paragraph 14;

(g)     Personnel of graphics, litigation support (including stenographic reporters, videographers, and/or their staff), and trial/jury consulting firms, including any mock jurors, engaged by a Party or its attorneys in connection with a lawsuit governed by this Protective Order who have signed or whose representative has signed Exhibit A hereto prior to any disclosure of Protected Matters; and

(h)     the author, addressee, or recipient of a document containing the information in a deposition or at trial; and to the extent the author, addressee or recipient is a former employee of the Producing Party, only if he or she signs the Confidentiality Undertaking.

4.     Protected Matters designated as "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" shall be restricted in circulation to Qualified Persons described in paragraphs 3(a), 3(c), 3(d), 3(e), 3(f), 3(g), and 3(h) above, and two (2) in-house counsel of a Receiving Party who have

responsibility for maintaining, defending, or evaluating this litigation if the in-house counsel signs the Confidentiality Undertaking and provides it to opposing counsel.

5.      Protected Matters designated as "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" shall be restricted in circulation to Qualified Persons described in paragraphs 3(a), 3(c) (excluding employees of 3(b)), 3(d), 3(e), 3(f), 3(g) (excluding mock jurors), and 3(h).

6.      To the extent that Protected Matters or information contained therein is used in depositions, at hearings, or at trial, such documents or information shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony and/or trial testimony referring to the Protected Matters or information contained therein.

7.      This Protective Order shall apply to the Parties and any Non-Party from whom discovery may be sought and who desires the protection of this Protective Order. Thus, any Non-Party requested or required to produce or disclose information in this proceeding, through subpoena or otherwise, may designate such information pursuant to the terms of this Protective Order.

8.      In the event a Receiving Party wishes to use any "CONFIDENTIAL" or "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material in any affidavits, briefs, memoranda of law, or other papers filed or introduced in Court in a lawsuit governed by this Protective Order, such information used therein shall be filed under seal with the Court. "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material must also be filed under seal in compliance with Paragraph 13(i).

9.      Nothing in this Protective Order shall preclude any Receiving Party to a lawsuit governed by this Protective Order or their attorneys from (1) showing a document prepared prior to the filing of this action and designated as "CONFIDENTIAL," "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY," or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" to an individual in a deposition or at trial who appears as an author, addressee or

recipient of a copy of the document on the document's face, and to the extent the author, addressee or recipient is a former employee of the Producing Party, only if he or she signs the Confidentiality Undertaking, or (2) disclosing or using, in any manner or for any purpose, any information or documents from the Party's own files which the Party itself has designated as "CONFIDENTIAL," "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY," or "RESTRICTED   CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" to an individual employed by the Party.

10.     The Receiving Party of any Protected Material shall have and maintain appropriate physical, organizational, and technical processes, security standards, guidelines, controls, and procedures to protect against a Data Breach ("Appropriate Safeguards"), and shall ensure that its professional vendors, experts and any other person or entity that receives Protected Material pursuant to this Stipulated Protective Order implements and maintains Appropriate Safeguards.

### Depositions

11.     Confidential Information disclosed at (a) the deposition of a Party or one of its present or former officers, directors, employees, agents or independent experts retained by counsel for the purpose of a lawsuit governed by this Protective Order, or (b) the deposition of a Non-Party, may be designated by any Producing Party (including the Non-Party disclosing any such Confidential information) as "CONFIDENTIAL," "CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY," or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material by indicating on the record at the deposition that the testimony is "CONFIDENTIAL," "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY," or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material and is subject to the provisions of this Protective Order. Any Producing Party (including the Non-Party having disclosed such Confidential Information) may also designate information disclosed at such deposition as "CONFIDENTIAL," "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY," or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material by notifying

all of the Parties in writing at the time of deposition or before twenty-one (21) days after receipt of the transcript. Each Receiving Party shall attach a copy of such written notice or notices to the face of the transcript and each copy thereof in his possession, custody, or control. Unless previously designated in accordance with this Protective Order, all deposition transcripts shall be treated as "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" for a period of twenty-one (21) days after the receipt of the transcript.

12.     At any time after the delivery of Protected Matters, counsel for the Receiving Party or Parties receiving the Protected Matters may challenge the designation of all or any portion thereof, including the level of the confidentiality designation, by providing written notice thereof to counsel for the Producing Party disclosing or producing the Protected Matters. If the Parties do not resolve the dispute within fourteen (14) days of the Producing Party receiving written notice of the challenge, the Receiving Party or Parties receiving the Protected Matters wishing to contest the designation may file a motion with the Court with regard to any Protected Matters in dispute. Upon the filing of such a motion by the Receiving Party or Parties, the Producing Party or Parties producing the Protected Matters shall have the burden of establishing that the disputed Protected Matters are entitled to confidential treatment at the designated level. All Protected Matters are entitled to confidential treatment pursuant to the terms of this Protective Order until and unless the Parties formally agree in writing to the contrary or a contrary determination is made by the Court as to whether all or a portion of the Protected Matters are entitled to confidential treatment at the designated level.

<strong><u>"Restricted Confidential – Outside Counsel's Eyes Only" Material</u></strong>

13.     Protected Matters designated as "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" shall be subject to additional protections given the particularly sensitive nature of the information, unless otherwise advised by the Producing Party:

(a)     All RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material shall be made available by the Producing Party to the Receiving Party's outside

counsel and/or experts who have been approved according to Paragraph 14 either in searchable PDF format or in native format in a secure room on a secured computer without Internet access or network access to other computers and with all input/output ports (such as USB) blocked, as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal or other transfer of any RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material outside or away from the computer on which the RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material is provided for inspection (the "Secure Computer"). The Secure Computer will be located at one of the three following locations: (i) the offices of outside counsel for the Producing Party in this Action (*e.g.,* Winston & Strawn in Dallas, Texas); (ii) the offices of Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC within the Western District of Texas; or (iii) at any other location mutually agreed upon by counsel for the Receiving Party and the Producing Party.

The parties agree to meet and confer if the Secure Computer was not manufactured within the past five (5) years and thereby slows down the inspection process. The Producing Party shall provide the Receiving Party with information explaining how to start, log on to, and operate the Secure Computer in order to access the produced RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material on the Secure Computer. After the Secure Computer has been prepared and provided to the Receiving Party, the Producing Party shall thereafter provide access to the Secure Computer during regular business hours on reasonable notice provided in writing by the Receiving Party (which shall be no less than at least five (5) business days' notice) and may be accessed by the Receiving Party using this process throughout the case up to and including trial. This written notice from the Receiving Party shall identify in writing to the Producing Party the persons who will be conducting the inspection or will be present during the inspection. The Producing Party shall install software tools that are customary for viewing and searching the Material on the Secure Computer. The Producing Party shall provide a list of the tools that it intends to install on the Secure

Computer twelve (12) business days before the Secure Computer is made available for inspection. The Receiving Party's outside counsel and/or experts who have been approved according to Paragraph 14 may request that commercially available software tools reasonably necessary to assist in reviewing and searching the electronic information be installed on the Secure Computer. The Receiving Party must provide the Producing Party with the software tool(s) and evidence sufficient to establish the existence of a license that authorizes such installation at least five (5) business days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for use on the Secure Computer. For emphasis, it should be noted that the tools for reviewing RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material may not be used to circumvent the protections of this Protective Order in any way. Moreover, the Receiving Party shall not at any time use any compilers, interpreters or simulators in connection with the Producing Party's RESTRICTED CONFIDENTIAL-OUTSIDE COUNSEL'S EYES ONLY Material, and in no event shall the Receiving Party cause tools to be installed on the Secure Computer that have the effect of altering, modifying, deleting, copying, or otherwise permitting the reproduction or removal of such RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material. In addition, the Receiving Party shall not be permitted to bring electronic devices, including but not limited to hard drives, cellular phones, PDAs, cameras, and voice recorders, into the location of the Secure Computer with the following exception.  Except as provided here and in Paragraph 13(i), no electronic copies of RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material shall be made.

(b) The Receiving Party's outside counsel and/or experts approved according to Paragraph 13 shall be entitled to take notes (electronic or nonelectronic) relating to the Source Code Material but may not copy the Source Code Material into such notes. To the extent the Receiving Party desires to take notes electronically, the Producing Party shall allow the Receiving Party to take notes on the Secure Computer or provide a note-taking computer (e.g., a computer, which is distinct

from the Secure Computer, that is not linked to any network, including a local area network ("LAN"), an intranet, or the Internet, and has image making functionality of any type disabled, including but not limited to camera or video functionality) ("Note-Taking Computer") with a current, widely used word processing program for the Receiving Party's use in taking such notes. The Note-Taking Computer shall be used for the sole purpose of note-taking and shall be retained by the Producing Party. The Note-Taking Computer shall have disk encryption and be password protected. Other than the Note-Taking Computer, use or possession of any input/output device (e.g., USB memory stick, mobile phone or tablet, camera or any camera-enabled device, CD, floppy disk, portable hard drive, laptop, or any device that can access the Internet or any other network or external system, etc.) is prohibited while accessing the Secure Computer.

(c)     Upon request, such notes shall be printed and promptly given to the Receiving Party to retain, and the computer cleared of such notes. Any such printed notes shall be designated as and treated as RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY material. Any printed notes shall also be treated as paper copies of RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY material, except that printed notes will not count toward the Receiving Party's page limits in Paragraph 13(d) below. Rather, printed notes shall be limited to a total of one hundred (100) pages. In the event this limit is inadequate for the Receiving Party, the Parties agree to negotiate in good faith to establish a reasonable extension on that limit. The Note-Taking Computer shall have no features which would hinder the complete clearing of the Receiving Party's notes after such notes have been printed. Any such notes shall not include copies or reproductions of portions of the Source Code Material, however, the notes may contain filenames, directory names, module names, or procedure names. No copies of all or any portion of the Source Code Material may leave the room in which the Source Code Material is inspected except as otherwise provided herein. Further, no written or electronic record of the Source Code Material is permitted except as otherwise provided herein. The Producing Party will not retain a copy of any

13

printed notes. The log of such notes need not be produced to any other party absent Court Order (e.g., potentially in connection with a Protective Order violation motion). During any review of Material on the Secure Computer, the Producing Party may visually monitor the activities of the Receiving Party's representatives from outside the room where the Secure Computer is located, but the Producing Party shall not make any recording, including any audio, video or digital recording, of the activities of the Receiving Party's representatives. However, in the event that any Material is reviewed on a Secure Computer at Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC using a software review tool licensed to Micron, a Micron employee shall operate such software review tool in cooperation with the Receiving Party to facilitate the review.

The Receiving Party shall also be entitled to take depositions of the Producing Party's experts and other witnesses with access to the Source Code Material on the Secure Computer during the deposition upon request prior to the deposition. To the extent there is any objection by the Producing Party to hold a deposition where the Secure Computer is located, the Parties shall meet and confer to determine another location mutually agreed upon by counsel for the Receiving Party and the Producing Party to hold the deposition where the witness can access Source Code Material.

(d)     Under no circumstances are printouts or copies of RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material to be made except by the Producing Party. At the request of the Receiving Party, the Producing Party shall provide paper copies ("Original Printouts") of portions of the Source Code Materials on the Secure Computer that are requested by the Receiving Party and are reasonably necessary to facilitate the Receiving Party's preparation of court filings, expert reports, and trial exhibits. The Parties acknowledge and agree that the purpose of the protection herein would be frustrated by printing large portions of code for review and analysis elsewhere. The total number of pages of "Original Printouts" shall not exceed 250 pages. If the Receiving Party has already received a total of 250 pages and believes that additional pages are

14

reasonably required for its case preparation, the Parties will follow the meet and confer requirements outlined below. Original Printouts that exceed 25 continuous pages shall be presumed excessive unless the Receiving Party provides a reasonable justification that such printed portions are necessary. The Producing Party shall Bates number, copy, and label "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" material on any Original Printouts. If the Producing Party objects that the portions requested to be printed are excessive and/or not reasonably necessary to any case preparation activity, the Producing Party shall make such objection known to the Receiving Party within five (5) business days. If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party or the Producing Party shall be entitled to seek a Court resolution of whether the print request is reasonably necessary to any case preparation activity as provided herein. The day after the completion of the meet and confer process, the Parties shall contact the Court's clerk to schedule a conference. The Producing Party must use its power to object reasonably and may not, for example, make an objection simply to introduce delay or attempt to discover privileged information. In the absence of any objection, or upon resolution of any such dispute by the Court, the Producing Party shall provide via overnight mail one copy set of such Original Printouts to the Receiving Party within five (5) business days. The Original Printouts shall constitute part of the RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material produced by the Producing Party in this action.

(e)     Unless otherwise agreed in advance by the Parties in writing, the Receiving Party's outside counsel and/or experts who have been approved according to Paragraph 13 shall remove all notes, documents, and all other materials from the room that may contain work product and/or attorney-client privileged information at the end of each day. Materials inadvertently left in the review room do not operate as a waiver of the attorney work product doctrine or any other applicable privilege and shall be returned to the owner promptly. The Producing Party shall not be responsible for any items left in the review room.

(f)     Other than as provided herein, the Receiving Party will not copy, remove, or otherwise transfer any RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material from the Secure Computer including, without limitation, copying, removing, or transferring the Material onto any other computers or peripheral equipment. The Receiving Party will not electronically transmit any RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY Material in any way from the Producing Party's facilities or the offices of its outside counsel of record. This provision does not prevent the Parties from including RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material in filings with the Court made under seal. Unless otherwise agreed by the Producing and Receiving Parties, service copies of such filings must be served via secure FTP or FedEx.

(g)     The Receiving Party's outside counsel of record may make no more than two (2) additional paper copies of any portions of the Original Printouts of RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material received from a Producing Party pursuant to Paragraph 12(c), not including copies attached to court filings or used at  depositions. The Receiving Party's outside counsel of record shall maintain a complete log of Bates numbers of printed RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material that lists the individuals who have reviewed and/or received paper copies of such Material, including the Bates number(s) of the copy and when it was provided to that person, and produce that log within five (5) business days of a Producing Party's written request. In addition, any outside experts or consultants of the Receiving Party with access to RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material shall not make any use of the Material for any purpose other than this Action.

(h)     The Receiving Party's outside counsel of record and any person receiving a copy of any RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material shall maintain and store any paper copies of the Material at their offices in a manner that prevents

duplication of or unauthorized access to the Material, including, without limitation, storing the Material in a locked room or cabinet at all times when it is not in use.

(i)     All paper copies of RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material shall be securely destroyed in a timely manner if they are no longer in use (*e.g.,* at the conclusion of a deposition). Copies of any such Material that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers. If the deposition exhibit has been marked up or altered in any way by the deponent, the Receiving Party shall store the exhibit in the same way paper copies of the RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material are stored.

Except as provided in this sub-paragraph, absent express written permission from the Producing Party, the Receiving Party may not create electronic images, or any other images, or make electronic copies, of the RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material from any paper copy of Material for use in any manner (including by way of example only, the Receiving Party may not scan the Material to a PDF or photograph the Material). Paper copies of the Original Printouts also may not be converted into an electronic document, and may not be scanned using optical character recognition ("OCR") technology. However, a Receiving Party may make and use images of portions of the Material if reasonably necessary for court filings, expert reports, discovery responses, and other similar documents. In preparing such documents, a Receiving Party shall not transmit RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material or any summaries of such documents that are in electronic form (e.g., PDF, TIFF, Word, Excel files) outside of the Receiving Party (*e.g*., in e-mail traveling on the Internet) unless the documents or summaries are encrypted using PGP© encryption with a pass phrase whose length is at least 10 characters. All such documents shall be clearly marked "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY Material." Unless agreed by the Producing Party, images

or copies of the Material shall not be included in any correspondence (references to production numbers shall be used instead).

## **Disclosure to Experts or Non-Party Consultants**

14.     An independent expert's or consultant's access to Protected Matters shall be subject to the terms in this paragraph, including the notice-and-objection provisions below, and the requirement that the expert or consultant execute the Confidentiality Undertaking attached hereto as Exhibit A. The Party that retained the expert or consultant shall retain the Confidentiality Undertaking and must provide a copy to every Producing Party whose Protected Matters the expert or consultant might access, prior to such access.

(a)     Before a Receiving Party may disclose, directly or indirectly, any Protected Matters to an independent expert or consultant, the Receiving Party must give written notice to the Producing Party of the following information as it relates to the expert or consultant:

(i)     current curriculum vitae, including the full name of the individual and the city and state of his or her primary residence;

(ii)     business address and title;

(iii)     nature of business or profession;

(iv)     any previous or current relationship (personal or professional) with any of the Parties or any prior assignees of any of the asserted patents that also manufacture or sell solid state drives;

(v)     a listing of other actions (including case name, case number, and court/agency) in which the individual has testified (at trial, deposition or in a hearing) over the last four years;

(vi)     the individual's current employer;

(vii)     all companies for which the individual has consulted or been employed by, within the past four years, the years of such consulting or employment and brief

description of the work performed for any position that the individual directly worked on managing data in non-volatile memory; and

(viii)   a copy of the expert's or consultant's signed Confidentiality Undertaking (in the form attached hereto as Exhibit A). A separate Confidentiality Undertaking shall not be required for staff members working under the supervision of an individual signing a Confidentiality Undertaking in the form of Exhibit A. An individual signing a Confidentiality Undertaking in the form of Exhibit A, however, shall accept full responsibility for taking measures to ensure that staff members working under his or her supervision comply with terms of this Protective Order.

(b)   A Party that makes a written notice and provides the information specified in the preceding paragraph may disclose the Protected Matters to the identified expert or consultant unless, within five business (5) days of the written notice, the Producing Party objects in writing.

(c)   If an objection is made, the Producing and Receiving Parties shall meet and confer to try to resolve the dispute by agreement. If no agreement is reached within five (5) business days, the Producing Party may move the Court for an order that access to Protected Matters be denied the designated individual, or other appropriate relief within five (5) additional business days. If the Producing Party moves the Court for relief, unless and until the Court determines otherwise, no disclosure of any such Protected Matters shall be made by the Receiving Party to any expert or consultant to whom an objection has been made. If the Producing Party does not move the Court for relief within five (5) business days, the Receiving Party may disclose the Protected Matters to the identified expert or consultant.

**<u>Inadvertent Failure to Designate</u>**

15.   If, through inadvertence, a Producing Party in a lawsuit governed by this Protective Order provides any information without marking the information as "CONFIDENTIAL," "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY," or "RESTRICTED

CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY," the Producing Party may subsequently inform the Receiving Party of the specific designation of the disclosed information, and the Receiving Party shall treat the disclosed information as "CONFIDENTIAL," "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY," or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material upon receipt of written notice from the Producing Party. To the extent the Receiving Party has already disclosed such information, the Receiving Party shall use its best efforts to promptly collect any copies of disclosed material that have been provided to individuals other than those authorized under this Protective Order, and if collected, shall destroy or return them to the Producing Party.     Inadvertent or unintentional production of "CONFIDENTIAL," "CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY," or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material that is not so designated shall not be deemed a waiver in whole or in part of a claim for treatment as "CONFIDENTIAL," "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY," or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY."

**Prosecution Bar**

16.    Any Material designated CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY that is related to managing data in solid state drive technologies, other than non-technical information, such as financial or licensing information, or any material designated RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY is subject to a PROSECUTION BAR. Absent written consent from the Producing Party, this PROSECUTION BAR means that any person employed or retained by the Receiving Party in this Action who has received and reviewed the Producing Party's Material described above shall not be Involved In The Prosecution Of Patents Or Patent Applications relating to managing data in solid state drive technologies from the time the affected individual first reviewed such Material through and including two (2) years following the entry of a final, non-appealable judgment or order or the complete settlement of all claims and

dismissal with or without prejudice in this Action. In addition, a person subject to this PROSECUTION BAR can participate or assist in a reexamination or review (including *inter partes* or post-grant review) by the United States Patent and Trademark Office of a patent asserted by Plaintiff in this Action, provided that such participation or assistance shall not include suggesting, drafting, or amending patent claim language.

17.     To minimize the risk of inadvertent disclosure, any party defending a patent in a reexamination or review that intends to seek claims amendments or new claims must erect an ethical wall between the attorney(s) who received "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material and the attorney(s) who are involved in seeking to amend the claims or prepare new claims in the proceeding. This PROSECUTION BAR shall begin when access to designated "CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY" Material is first received by the affected individual and shall end one (1) year after final termination of this action.

## Privilege/Work Product

18.     The Parties agree to make a good-faith effort to provide a privilege log. The Parties further agree that the following information need not be included on a privilege log: documents, communications and other information (1) regarding selection of counsel; (2) regarding activities undertaken in compliance with the duty to preserve information pursuant to Fed. R. Civ. P. 26(b)(3)(A) and (B); or (3) generated after the filing of the complaint in this lawsuit.

19.     If a Producing Party inadvertently produces a document or tangible item that it later discovers or in good faith asserts to be privileged, protected by the work product doctrine, or subject to some other immunity from disclosure ("Privileged Material") the production of that Privileged Material shall not be deemed to constitute a waiver of any applicable privileges, work product protection, or immunity from disclosure. In such circumstances, upon discovery of the inadvertent

disclosure, the Producing Party shall immediately notify the Receiving Party of the inadvertent production, and request either the return or confirmation of destruction of the Privileged Materials. Within five (5) business days of receiving such notification, the Receiving Party shall return or confirm destruction of all such materials, except for one copy to be used solely for the purpose of challenging the privilege of mistaken production. Such return or confirmation of destruction shall not preclude the Receiving Party from seeking to compel production of the materials within twenty-one (21) business days of receiving such notification or at such other time as the Parties agree to in writing, and shall not constitute an admission by the Receiving Party that the materials were, in fact, privileged or otherwise protected in any way. The Producing Party shall retain the Privileged Material for submission to the Court in the event the Receiving Party moves to compel. Summaries of inadvertently produced documents shall be destroyed by the Receiving Party within twenty-one (21) business days if a motion to compel is not brought or is denied.

20.     If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Matters to any person or in any circumstance not authorized under this Protective Order, the Receiving Party must immediately (a) notify in writing the Producing Party of the unauthorized disclosures, (b) use its best efforts to retrieve all copies of the Protected Matters, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Protective Order, and (d) request such person or persons to execute the "Confidentiality Undertaking" that is attached hereto as Exhibit A. Unauthorized or inadvertent disclosure does not change the status of Protected Matters or waive the right to hold the disclosed document or information as Protected Matters.

## **Third Party Requests**

21.     If any Receiving Party under the terms of this Protective Order receives a subpoena, order, or other legal process commanding the production of such Protected Matters (a "Third Party Request"), such Receiving Party shall not produce any Protected Matters in response to the Third Party Request without the prior written consent of the Producing Party or an order of a court of

competent jurisdiction, except as otherwise provided by this paragraph. A Receiving Party receiving a Third Party Request shall promptly notify the Producing Party of such Third Party Request, in writing (by e-mail or fax, if possible) immediately and in no event more than three (3) business days after receiving the Third Party Request. Such notification must include a copy of the subpoena or court order. The Receiving Party also must immediately inform in writing the Party who sent the Third Party Request that some or all the material covered by the Third Party Request is the subject of this Protective Order and include a copy of this Protective Order. The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Producing Party in this action an opportunity to protect its confidentiality interests in the court from which the Third Party Request issued. The Producing Party shall bear the burdens and the expenses of seeking protection of its confidential material in that court. Nothing in these provisions should be construed as requiring a Receiving Party in this Action to disobey a lawful directive from another court.

22.     Other proceedings: By entering this Protective Order and limiting the disclosure of information in any lawsuit governed by this Protective Order, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this Protective Order who becomes subject to a motion to disclose another party's information designated as confidential pursuant to this Protective Order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

### A Non-Party's Protected Material Sought to Be Produced in This Litigation

23.     The terms of this Protective Order are applicable to information produced by a Non-Party in this Action and designated as "CONFIDENTIAL," "CONFIDENTIAL OUTSIDE COUNSEL'S EYES ONLY" or "RESTRICTED CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY". Such information produced by Non-Parties in connection with this Action is

protected by the remedies and relief provided by this Protective Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(a)     In the event that a Party is required, by a valid discovery request, to produce a Non-Party's Confidential Information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's Confidential Information, then the Party shall:

(i)     promptly notify in writing the Non-Party that some or all of the Non-Party's Confidential Information is subject to a discovery request;

(ii)    promptly provide the Non-Party with a copy of the Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(iii)   make the information requested available for inspection by the Non-Party.

(b)     If the Non-Party fails to object or seek a protective order from this Court within the time period provided for in the agreement with the Non-Party not to produce the Non-Party's Confidential Information, or if no time period is provided, within 14 days of receiving the notice and accompanying information, the party receiving the discovery request may produce the Non-Party's Confidential Information responsive to the discovery request. If the Non-Party timely seeks a protective order, the party receiving the discovery request shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the Court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this Court of its Material.

### Discovery From Experts and Consultants

24.     Discovery of materials from experts and consultants will be subject to the following limitations:

(a)     The following materials will be excluded from expert discovery or inquiry at

trial: (1) draft expert reports or declarations and outlines thereof; (2) documents or notes prepared by testifying experts or their assistants, except for those that form or provide a basis for the expert's opinion; (3) communications between testifying experts, or their assistants, and outside counsel of record, except for those which form or provide a basis for the expert's opinion; and (4) communications between testifying experts, or their assistants, and other experts or consultants (testifying or not), except for those which form or provide a basis for the expert's opinions.

(b)     Notwithstanding the foregoing, (1) all documents provided or made known to experts (including, without limitation, publications and documents produced in discovery), other than those generated for the purpose of litigation and/or for the purpose of communicating with the expert, that were considered by the expert in formulating his or her opinion (whether or not they support the opinions), (2) the amount of time an expert spent on the litigation, and (3) the compensation received by the expert for his work on the litigation are discoverable and may be the subject of questioning at deposition or trial.

25.     No discovery relating to work performed for this litigation can be taken from any non-testifying consultant except to the extent that the consultant has provided information or opinions that form a basis for a testifying expert's opinion.

## Termination of Lawsuit

26.     After termination of this Action, the provisions of this Protective Order shall continue to be binding, except with respect to those documents and information that become a matter of public record. This Court retains and shall have continuing jurisdiction over the Parties and recipients of the Protected Matters for enforcement of the provisions of this Protective Order following termination of this Action.

27.     Within sixty (60) days after final termination of this Action by dismissal, judgment, or settlement, counsel for the Party or Parties to this Action receiving Protected Matters shall return or destroy the Protected Matters and all copies thereof, and will destroy all documents and things

containing information based on such Protected Matters, including all hard copy print of the Source Code Material, except that counsel for each Party may retain one hard copy and one electronic copy (excluding back-up copies maintained on storage systems in the regular course of business) of (i) its correspondence file of this case; (ii) its pleadings file, including all briefs, memoranda, affidavits, supporting materials, and all papers served on the Party; (iii) any briefs and appendices on appeal; (iv) all legal research memoranda, expert communications, work product or report, and other work product; (v) its file of deposition transcripts and accompanying exhibits; and (vi) its file of hearing and trial transcripts and accompanying exhibits.

28.     Nothing in the preceding paragraph requires destruction of data on outside counsel's back-up tapes for archival purposes.  Protected Material should not be stored on back-up tapes beyond what is authorized in Paragraph 27.

29.      This Protective Order shall be binding upon the Parties and their attorneys, successors, executors, personal representatives, administrators, heirs, legal representatives, assigns, subsidiaries, divisions, employees, agents, independent contractors, or other persons or organizations over which they have control. The terms of this Protective Order shall survive the final termination of this action to the extent that any Protected Matters are not or do not become known to the public (or to the extent that any Protected Matters have become known to the public due to a violation of this Protective Order). This Court shall retain jurisdiction over this action for the purpose of enforcing this Protective Order.

## **Miscellaneous**

30.     If any Party violates the terms of this Protective Order, the Party violating this Order shall be subject to sanctions, or any other remedies as appropriate, as ordered by the Court.

31.     Nothing in this Protective Order imposes an affirmative obligation on a Party to make discovery of any particular document, data, or other information.

32.     Nothing in this order will be construed to limit in any way any Party's use of its own

Protected Matters nor will it affect any Party's subsequent waiver of its own prior designation with respect to its own Protected Matters.

33.     Nothing in this Protective Order shall bar or otherwise restrict any attorney herein from rendering advice to his client with respect to this Action and, in the course thereof, referring to or relying upon his examination of Protected Matters produced by another Party or a Non-Party; provided, however, that in rendering such advice and in otherwise communicating with his client, the attorney shall not make specific disclosure of any item of the Protected Matters that such person is prohibited from seeing.

ORDERED this___29th____day of October __, 2020.

**ALAN D ALBRIGHT**
**UNITED STATES DISTRICT JUDGE**